# LAWRENCE, GUARDIAN AND NEXT FRIEND ON BEHALF OF LAWRENCE, A MINOR v. CHATER, COMMISSIONER OF SOCIAL SECURITY

No. 94–9323.   Decided January 8, 1996

PER CURIAM.

Under the Social Security Act, the unmarried minor "child" of a deceased individual who was insured under the Act may receive survivors' benefits if she was "dependent upon such individual" prior to his death. 49 Stat. 623, as amended, 42 U. S. C. § 402(d)(1)(C) (1988 ed.). In order to determine whether a claimant is, for these purposes, the "child" of the deceased, and, as such, eligible to receive benefits, the Commissioner of Social Security "shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which [the] insured individual . . . was domiciled at the time of his death." 42 U. S. C. § 416(h)(2)(A) (1988 ed.).

The petitioner in this case, Lawrence, asserts an entitlement to benefits under these provisions. In so doing, she acknowledges that the relevant state law, that of North Car-

olina, appears on its face to defeat her claim by imposing procedural requirements on proof of paternity (which it requires as a prerequisite for intestate succession) that she cannot meet. She contends, however, that these difficulties can be overcome in her case as they were in *Handley* v. *Schweiker*, 697 F. 2d 999 (1983). In that case, the Court of Appeals for the Eleventh Circuit held that state-law requirements of proof of paternity can only be applied against a claimant for benefits under § 416(h)(2)(A) insofar as they are constitutional, and that an Alabama law similar to the North Carolina law involved here was unconstitutional. In contrast, in the case before us, the Court of Appeals for the Fourth Circuit upheld the Social Security Administration's Appeals Council's denial of benefits to Lawrence. The Court of Appeals expressly adopted the rationale for rejecting her claim that the Government advanced in its brief to that court: that the constitutionality of a state paternity law need not be considered before applying it to determine entitlement to benefits under the federal statutory scheme. Lawrence petitioned for certiorari to review that decision.

In his response, the Solicitor General advises us that the "Social Security Administration has re-examined" the role of state paternity and intestacy laws in the federal benefits scheme, and now interprets the Social Security Act as "requir[ing] a determination, at least in some circumstances, of whether the state intestacy statute is constitutional." Brief for Respondent 8. He also correctly notes that the Act directs the Commissioner of Social Security—not, in the first instance, the courts—to "apply such law as would be applied . . . by the courts of the State" concerned. § 416(h)(2)(A). Without conceding Lawrence's ultimate entitlement to benefits, he invites us to grant certiorari, vacate the judgment below, and remand the case (GVR) so that the Court of Appeals may either decide it in light of the Commissioner's new statutory interpretation or remand the case to the Commissioner for reconsideration in light of that interpretation.

We conclude both that we have the power to issue a GVR order, and that such an order is an appropriate exercise of our discretionary certiorari jurisdiction.

Title 28 U. S. C. § 2106 appears on its face to confer upon this Court a broad power to GVR: "The Supreme Court or any other court of appellate jurisdiction may . . . vacate . . . any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and . . . require such further proceedings to be had as may be just under the circumstances." In his dissent issued today in this case and in *Stutson* v. *United States, post,* p. 193, another case in which we issue a GVR order, JUSTICE SCALIA contends that "traditional practice" and "the Constitution and laws of the United States" impose "implicit limitations" on this power. *Post,* at 178. We respectfully disagree. We perceive no textual basis for such limitations. The Constitution limits our "appellate Jurisdiction" to issues of "[federal] Law and Fact," see Art. III, § 2, but leaves to Congress the power to "ordain and establish . . . inferior Courts," Art. III, § 1, and to make "Exceptions" and "Regulations" limiting and controlling our appellate jurisdiction. Insofar as Congress appears to have authorized such action, we believe that this Court has the power to remand to a lower federal court any case raising a federal issue that is properly before us in our appellate capacity.

Our past practice affirms this conclusion. Although, as JUSTICE SCALIA's dissent explains, *post,* at 179–183, the *exercise* of our GVR power was, until recent times, rare, its infrequent early use may be explained in large part by the smaller size of our certiorari docket in earlier times. Regardless of its earlier history, however, the GVR order has, over the past 50 years, become an integral part of this Court's practice, accepted and employed by all sitting and recent Justices. We have GVR'd in light of a wide range of developments, including our own decisions, see *post,* at 180 (SCALIA, J., dissenting), State Supreme Court decisions, see,

*e. g., Conner* v. *Simler,* 367 U. S. 486 (1961), new federal statutes, see, *e. g., Sioux Tribe of Indians* v. *United States,* 329 U. S. 685 (1946), administrative reinterpretations of federal statutes, see, *e. g., Schmidt* v. *Espy,* 513 U. S. 801 (1994), new state statutes, see, *e. g., Louisiana* v. *Hays,* 512 U. S. 1230 (1994), changed factual circumstances, see, *e. g., NLRB* v. *Federal Motor Truck Co.,* 325 U. S. 838 (1945) (demilitarization of employees), and confessions of error or other positions newly taken by the Solicitor General, see, *e. g., Wells* v. *United States,* 511 U. S. 1050 (1994); *Reed* v. *United States,* 510 U. S. 1188 (1994); *Ramirez* v. *United States,* 510 U. S. 1103 (1994); *Chappell* v. *United States,* 494 U. S. 1075 (1990); *Polsky* v. *Wetherill,* 403 U. S. 916 (1971), and state attorneys general, see, *e. g., Cuffle* v. *Avenenti,* 498 U. S. 996 (1990); *Nicholson* v. *Boles,* 375 U. S. 25 (1963).

This practice has some virtues. In an appropriate case, a GVR order conserves the scarce resources of this Court that might otherwise be expended on plenary consideration, assists the court below by flagging a particular issue that it does not appear to have fully considered, assists this Court by procuring the benefit of the lower court's insight before we rule on the merits, and alleviates the "[p]otential for unequal treatment" that is inherent in our inability to grant plenary review of all pending cases raising similar issues, see *United States* v. *Johnson,* 457 U. S. 537, 556, n. 16 (1982); cf. *Griffith* v. *Kentucky,* 479 U. S. 314, 323 (1987) ("[W]e fulfill our judicial responsibility by instructing the lower courts to apply the new rule retroactively to cases not yet final"). Where intervening developments, or recent developments that we have reason to believe the court below did not fully consider, reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the litigation, a GVR order is, we believe, potentially appropriate. Whether a GVR order is ulti-

mately appropriate depends further on the equities of the case: If it appears that the intervening development, such as a confession of error in some, but not all, aspects of the decision below, is part of an unfair or manipulative litigation strategy, or if the delay and further cost entailed in a remand are not justified by the potential benefits of further consideration by the lower court, a GVR order is inappropriate. This approach is similar in its flexibility to this Court's longstanding approach to applications for stays and other summary remedies granted without determining the merits of the case under the All Writs Act, 28 U. S. C. § 1651. See, *e. g., Heckler* v. *Lopez*, 463 U. S. 1328 (1983) (REHNQUIST, J., in chambers) (staying a District Court order pending the decision on the merits of the Court of Appeals). (Naturally, because GVR orders are premised on matters that we have reason to believe the court below did not fully consider, and because they require only further consideration, the standard that we apply in deciding whether to GVR is somewhat more liberal than the All Writs Act standard, under which relief is granted only upon a showing that a grant of certiorari and eventual reversal are probable, see *id.*, at 1330.) Used in accordance with this approach, the GVR order can improve the fairness and accuracy of judicial outcomes while at the same time serving as a cautious and deferential alternative to summary reversal in cases whose precedential significance does not merit our plenary review.

JUSTICE SCALIA's dissent would confine GVR's to three categories of cases:

> "(1) where an intervening factor has arisen that has a legal bearing upon the decision, (2) where, in a context not governed by *Michigan* v. *Long*, 463 U. S. 1032 (1983), clarification of the opinion below is needed to assure our jurisdiction, and (3) . . . where the respondent or appellee confesses error in the judgment below." *Post*, at 191–192.

While a large proportion of this Court's GVR orders fall within these categories, we find that, especially as the dissent construes them, they are too narrow to account for the full extent of our actual practice. We find two aspects in particular of the dissent's approach too restrictive. First, the dissent would insist that only matters that the lower court had no "opportunity" to consider can be the basis for GVR orders. Second, it would impose special restrictions as to when the Court may GVR in light of changes of position by litigants.

JUSTICE SCALIA's dissent concedes—correctly, we believe—that its first category—"intervening factor[s]"— must be extended to include at least Supreme Court decisions rendered so shortly before the lower court's decision that the lower court had no "opportunity" to apply them. *Post*, at 181. The dissent does not explain, however, why what the lower court had an "opportunity" to consider should be decisive, or how its "opportunity" is to be assessed. In *Robinson* v. *Story*, 469 U. S. 1081 (1984), we GVR'd for further consideration in light of a Supreme Court decision rendered almost three months *before* the summary affirmance by the Court of Appeals that was the subject of the petition for certiorari. Were those three months sufficient "opportunity" for the court to apprise itself (or be apprised by the parties) of the new, potentially relevant Supreme Court decision? If *Robinson* was properly GVR'd, we have difficulty understanding the dissent's objection to our GVR order today in *Stutson*, where, as in *Robinson*, the Court of Appeals wrote no opinion to show whether or how it considered a precedent of ours that the District Court had had no opportunity to consider. In both cases, the Court of Appeals "*might* (or might not) have relied on a standard [nonapplication of the prior Supreme Court decision] that *might* (or might not) be wrong [and] that *might* (or might not) have affected the outcome." *Post*, at 185 (SCALIA, J., dissenting). The only pertinent difference that we can discern between

the two cases is that the recent Supreme Court precedent was briefed to the Court of Appeals in *Stutson,* but we have never held lower court briefing to bar our review and vacatur where the lower court's order shows no sign of having applied the precedents that were briefed. Compare *post,* at 185–186 (asserting that "we have no power" to vacate and remand in *Stutson* after relevant briefing and a summary order below), with, *e. g., Netherland* v. *Tuggle,* 515 U. S. 951 (1995) *(per curiam)* (vacating Court of Appeals' summary order staying execution for probable failure to apply a 12-year-old Supreme Court precedent that the parties briefed to the Court of Appeals; this Court itself granted a stay a week later, applying that precedent, see *Tuggle* v. *Netherland,* 515 U. S. 1188 (1995)). As the prevalence of summary dispositions by the Courts of Appeals continues to increase with the burgeoning federal docket—in 1994, over 11% of Court of Appeals decisions on the merits,[1] and many more procedural decisions, were summary—such cases will, no doubt, arise more frequently. In this context, it is important that the meaningful exercise of this Court's appellate powers not be precluded by uncertainty as to what the court below *"might . . .* have relied on." And we are well aware, as are Supreme Court practitioners and lower courts, that while not immune from our plenary review, ambiguous summary dispositions below tend, by their very nature, to lack the precedential significance that we generally look for in deciding whether to exercise our discretion to grant plenary review. We are therefore more ready than the dissent to issue a GVR order in cases in which recent events have cast substantial doubt on the correctness of the lower court's summary disposition.

With regard to confessions of error and other changes of position by litigants, we agree on several points. All Mem-

---

[1] See Administrative Office of United States Courts, Reports of Proceedings of Judicial Conference of the United States, 1994, table S–3 (3,080 out of 27,219 decisions on the merits).

bers of the Court are agreed that we "should [not] mechanically accept any suggestion from the Solicitor General that a decision rendered in favor of the Government by a United States Court of Appeals was in error," *Mariscal* v. *United States*, 449 U. S. 405, 406 (1981) (REHNQUIST, J., dissenting). And the dissent acknowledges as "well entrenched," *post*, at 183 (opinion of SCALIA, J.), our practice of GVR'ing in light of plausible confessions of error without determining their merits. Moreover, the dissent is ready in principle to GVR in light of a new agency interpretation of a statute that is entitled to deference under the rule of *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). *Post*, at 186–187.

In other respects, however, our approaches to changes of position by litigants diverge. JUSTICE SCALIA's dissent disapproves (although it acknowledges) this Court's well-established practice of GVR'ing based on confessions of error that do not purport to concede the whole case. *Post*, at 183, 184–185; cf., *e. g.*, *Moore* v. *United States*, 429 U. S. 20 (1976) (GVR'ing based on the Solicitor General's confession of error, notwithstanding the Solicitor General's unresolved claim that the error was harmless). The dissent would apparently insist that such GVR's be confined to cases in which the confession of error concerns a "legal point on which the lower court explicitly relied," or on which we otherwise "know" for certain that the lower court's judgment rested. *Post*, at 185. But, given the legitimacy of GVR's on the basis of confessions of error without determining the merits, we do not understand why a reasonable probability that the lower court relied on the point at issue should not suffice. As we have explained, *supra*, at 167, we have GVR'd on the basis of a reasonable probability of a change in result in nonconfession of error cases, see, *e. g.*, *Robinson* v. *Story, supra*. We see no special reason why, in a confession of error case, a *certainty* that the lower court relied on the point in question should be necessary before we may GVR on the basis of a

*reasonable probability* that giving the lower court the opportunity to consider that point anew will alter the result.

Similarly, we reject JUSTICE SCALIA's dissent's other requirement of certainty for GVR's founded on a change of position by the Government. The dissent accepts in principle that a new interpretation of a statute adopted by the agency charged with implementing it may be entitled to deference in the context of litigation to which the Government is a party. But the dissent would require that before such new interpretation may be the basis for a GVR order, we must be "*certain* that the change in position is legally cognizable," *post*, at 187 (emphasis added), in the sense that it is "entitled to deference," *post*, at 188, despite its timing, in that particular case. This requirement, too, appears to be confined to cases in which the event on which the GVR is based is a change of position by the Government, see *post*, at 187; we do not, for example, understand the dissent to contend that a similar requirement of "lega[l] cognizab[ility]" should apply to GVR's in habeas corpus cases in which the procedural bar that we recognized in *Teague* v. *Lane*, 489 U. S. 288 (1989), might apply. Again, we do not understand the rationale for imposing such special requirements on GVR's based on a change of position. If it appears reasonably probable that a confession of error reveals a genuine and potentially determinative error by the court below, a GVR may be appropriate; similarly, we believe that if an agency interpretation is reasonably probably entitled to deference and potentially determinative, we may GVR in light of it. It is precisely because of uncertainty that we GVR. We do not see why uncertainty as to the "lega[l] cognizab[ility]" of an agency interpretation in a particular case should be treated differently from uncertainty as to its application in that case. Indeed, to determine on the merits whether deference is owed to the agency interpretation, based on a circumstance—*i. e.*, its timing with respect to the case at hand—that will not be present in any other case brought

under the statute at issue, when the Court of Appeals has had no "opportunity" to consider the new agency interpretation, appears to us to defeat the purpose of GVR'ing. Rather, we think it appropriate to apply our normal "reasonable probability" test, and to defer any special concerns about strategic litigating behavior that are raised by changes in the Government's position to consideration of the equities. Under our approach, neither uncertainty as to whether the Government's change of position, if accepted, would be outcome determinative, nor uncertainty as to the "lega[l] cognizab[ility]" of an administrative interpretation, preclude a GVR if the overall probabilities and equities support the GVR order. Indeed, we issued just such a GVR order last Term, without recorded dissent. See *Schmidt* v. *Espy*, 513 U. S. 801 (1994) (GVR on the basis of the Solicitor General's representation that "[a]fter further examination of the regulation and its application in the present case, . . . the Department of Agriculture has determined that petitioners' leaseback/buyback application should be reconsidered without respect to the good faith requirement," Brief for Respondent in *Schmidt* v. *Espy*, O. T. 1994, No. 93–1707, p. 7; see also *id.*, at 10, n. 5 (maintaining that other obstacles to petitioners' application might remain)).

Our differences with JUSTICE SCALIA's dissent should not overshadow the substantial level of agreement shared by all Members of this Court. On the one hand, all are agreed that a wide range of intervening developments, including confessions of error, may justify a GVR order. On the other hand, all are agreed that our GVR power should be exercised sparingly. This Court should not just GVR a case "because it finds the opinion, though arguably correct, incomplete and unworkmanlike; or because it observes that there has been a postjudgment change in the personnel of the state supreme court, and wishes to give the new state justices a shot at the case." *Post*, at 189 (SCALIA, J., dissenting); accord, *Alvarado* v. *United States*, 497 U. S. 543, 545 (1990) (REHNQUIST,

C. J., dissenting). Respect for lower courts, the public interest in finality of judgments, and concern about our own expanding certiorari docket all counsel against undisciplined GVR'ing. It remains to apply these principles to the facts of this case.

The feature of this case that, in our view, makes a GVR order appropriate is the new interpretation of the Social Security Act that the Solicitor General informs us that the Social Security Administration, the agency charged with implementing that Act, has adopted. As JUSTICE SCALIA's dissent notes, *post*, at 187, we have not settled whether and to what extent deference is due to an administrative interpretation—its "lega[l] cognizab[ility]"—in a case that has already reached the appeal or certiorari stage when that interpretation is adopted. But in our view, see *supra*, at 172–173, such uncertainty does not preclude a GVR. Indeed, it is precisely because we are uncertain, without undertaking plenary analysis, of the legal impact of a new development, especially one, such as the present, which the lower court has had no opportunity to consider, that we GVR. Here, as in *Schmidt, supra*, the Solicitor General has recommended judicial reconsideration of the merits, while not conceding the petitioner's ultimate entitlement to statutory benefits, based on a new statutory interpretation that will apparently be applied, and will probably be entitled to deference, in future cases nationwide. Here, as in *Schmidt*, our summary review leads us to the conclusion that there is a reasonable probability that the Court of Appeals would conclude that the timing of the agency's interpretation does not preclude the deference that it would otherwise receive, and that it may be outcome determinative in this case. A GVR order is, therefore, appropriate, subject to the equities.

As to the equities, it seems clear that they favor a GVR order here. That disposition has the Government's express support, notwithstanding that its purpose is to give the Court of Appeals the opportunity to consider an administrative interpretation that appears contrary to the Govern-

ment's narrow self-interest. And the Government has informed us that it intends to apply that interpretation to future cases nationwide. Giving Lawrence a chance to benefit from it furthers fairness by treating Lawrence like other future benefits applicants. We acknowledge the dissent's concern that postlitigation interpretations may be the product of unfair or manipulative Government litigating strategies, see *post*, at 187, and we therefore view late changes of position by the Government with some skepticism. That *general* concern does not, however, appear to us to require that we deprive Lawrence of the benefit of a favorable administrative reinterpretation in these *particular* circumstances. We believe, therefore, that the equities and legal uncertainties of this case together merit a GVR order.[2]

Accordingly, the motion for leave to proceed *in forma pauperis* and the petition for a writ of certiorari are granted. The judgment is vacated and the case is remanded to the United States Court of Appeals for the Fourth Circuit for further consideration in light of the position taken in the brief for respondent filed by the Solicitor General, August 17, 1995.

JUSTICE STEVENS, concurring.*

The Court persuasively explains why we have "the power to remand to a lower federal court any case raising a federal issue that is properly before us in our appellate capacity." *Ante*, at 166. That conclusion comports with a primary characteristic—and, I believe, virtue—of our discretionary authority to manage our certiorari docket: our ability to

---

[2] In a letter filed on October 24, 1995, the Solicitor General advised this Court of a July 1995 amendment to the North Carolina paternity statute, N. C. Gen. Stat. § 49–14(c). We find it unnecessary to decide whether this development independently justifies our GVR order. The Court of Appeals is free to consider its significance on remand.

*[This opinion applies also to No. 94–8988, *Stutson* v. *United States*, *post*, p. 193.]

apply the "totality-of-the-circumstances" approach that JUSTICE SCALIA finds objectionable. *Post*, at 191. The Court's wise disposition of these petitions falls squarely within the best traditions of its administration of that docket. I therefore join the Court's opinions.

CHIEF JUSTICE REHNQUIST, concurring in No. 94–9323 and dissenting in No. 94–8988, *post*, p. 193.

I agree, for the reasons given by JUSTICE SCALIA, that the Court is mistaken in vacating the judgment in No. 94–8988, *Stutson* v. *United States, post*, p. 193. I also agree with much of the rest of JUSTICE SCALIA's dissent, but I do not agree with that portion, *post*, at 179, dealing with what he describes as "situations calling forth the special deference owed to state law and state courts in our system of federalism." Of the three cases that he cites for this proposition, one, *Missouri ex rel. Wabash R. Co.* v. *Public Serv. Comm'n*, 273 U. S. 126 (1927), came to this Court on writ of error and therefore was required to be decided on the merits. The second, *State Farm Mut. Automobile Ins. Co.* v. *Duel*, 324 U. S. 154 (1945), came to us on appeal from a State Supreme Court, and was thus also required to be decided on the merits. The third, *Huddleston* v. *Dwyer*, 322 U. S. 232 (1944), was a case in which certiorari had already been granted, and the case argued on the merits. None of them, then, involved a choice between denying certiorari, on the one hand, and simply vacating the judgment of the lower court without any opinion, on the other. Vacating a judgment without explanation when the alternative is to simply deny certiorari involves at best the correction of perceived error made by the lower courts. In this connection, we would do well to bear in mind the admonition of Chief Justice William Howard Taft, one of the architects of the Certiorari Act of 1925, as described by his biographer:

"It was vital, he said in opening his drive for the Judges' bill, that cases before the Court be reduced without lim-

iting the function of pronouncing 'the last word on every important issue under the Constitution and the statutes of the United States.' A Supreme Court, on the other hand, should not be a tribunal obligated to weigh justice among contesting parties.

" 'They have had all they have a right to claim,' Taft said, 'when they have had two courts in which to have adjudicated their controversy.' " 2 H. Pringle, The Life and Times of William Howard Taft 997–998 (1939).

I agree with the decision announced in the *per curiam* to vacate the judgment of the Court of Appeals for the Fourth Circuit in No. 94–9323, *Lawrence* v. *Chater.* Whether or not the change of position by the Social Security Administration is "cognizable," in the words of JUSTICE SCALIA, *post,* at 187, it is perfectly reasonable to request the Court of Appeals to answer that question in the first instance.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, dissenting.*

I dissent because I believe that the dispositions in both No. 94–8988, *post,* p. 193, and No. 94–9323, *ante,* p. 163, are improper extensions of our limited power to vacate without first finding error below.

It sometimes occurs that, after having considered the lower court decision and found error, an appellate court merely reverses or vacates and then remands—that is, it sets the judgment aside and sends the case back to the lower court for further proceedings, rather than entering or directing entry of judgment for the appellant or petitioner. That is the appropriate course whenever the finding of error does not automatically entitle the appellant or petitioner to judgment, and the appellate court cannot conduct (or chooses not to conduct) the further inquiry necessary to resolve the ques-

---

*[This opinion applies also to No. 94–8988, *Stutson* v. *United States, post,* p. 193.]

tions remaining in the litigation. Our books are full of such cases, from *Glass* v. *Sloop Betsey*, 3 Dall. 6 (1794), and *Clarke* v. *Russel*, 3 Dall. 415 (1799), to *Vernonia School Dist. 47J* v. *Acton*, 515 U. S. 646 (1995), and *Tuggle* v. *Netherland, ante*, p. 10.

What is at issue here, however, is a different sort of creature, which might be called "no-fault V&R": vacation of a judgment and remand *without* any determination of error in the judgment below. In our discretionary certiorari system of review, such an order has acquired the acronym "GVR"— for the Court *grants* certiorari, *vacates* the judgment below, and *remands* for further proceedings.[1] The question presented by today's cases is whether there is any limitation (other than the mandate "do what is fair") upon this practice. The Court's *per curiam* opinions answer "no"; I disagree.

Title 28 U. S. C. § 2106 provides that "[t]he Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." This facially unlimited statutory text is subject to the implicit limitations imposed by traditional practice and by the nature of the appellate system created by the Constitution and laws of the United States. The inferior federal courts (to say nothing of state courts) are not the creatures

---

[1] I emphasize that what is at issue here is our power to set aside a valid judgment—*not*, as JUSTICE STEVENS' concurrence would have it, "our discretionary authority to manage our certiorari docket." *Ante*, at 175. We do the latter by accepting or declining review. But "[w]henever this Court grants certiorari and vacates a court of appeals judgment in order to allow that court to reconsider its decision . . . , the Court *is acting on the merits*." *Board of Trustees of Keene State College* v. *Sweeney*, 439 U. S. 24, 25–26 (1978) (STEVENS, J., dissenting) (emphasis added). Thus, today's orders go far beyond what JUSTICE STEVENS now refers to as "administration of [our certiorari] docket." *Ante*, at 176.

and agents of this body—as are masters, whose work we may reject and send back for redoing at our own pleasure. Inferior courts are separately authorized in the Constitution, see Art. I, § 8; Art. III, § 1, created by Acts of Congress, see, e. g., Judiciary Act of 1789, 1 Stat. 73; Evarts Act, Act of Mar. 3, 1891, 26 Stat. 826, and staffed by judges whose manner of appointment and tenure of office are the same as our own, see U. S. Const., Art. II, § 2; Art. III, § 1; 28 U. S. C. §§ 44, 133, 134. Despite the unqualified language of § 2106, we cannot, for example, "reverse" a judgment of one of these courts "and direct the entry" of a different judgment whenever we disagree with what has been done, but only when we can identify a controlling error of law. And I think we cannot "vacate" and "remand" in the circumstances here.

The Court today seeks to portray our no-fault V&R practice as traditionally covering a kaleidoscopic diversity of situations. See *Lawrence* v. *Chater, ante,* at 166–167. That is in my view a misportrayal; the practice has always been limited to a few discrete categories of cases. It began, apparently, in situations calling forth the special deference owed to state law and state courts in our system of federalism. In *Missouri ex rel. Wabash R. Co.* v. *Public Serv. Comm'n,* 273 U. S. 126 (1927), for example, rather than find error on the basis of the federal constitutional claims raised, this Court set aside the judgment of the Missouri Supreme Court and remanded the case to that court for further proceedings so that it could consider the meaning and effect of a state statute that had been enacted after its judgment had been entered. We reasoned that "[w]hile this Court may decide these [state-law] questions, it is not obliged to do so, and in view of their nature, we deem it appropriate to refer the determination to the state court." *Id.,* at 131. In other words, we left it to the state court to decide the effect of the intervening event, rather than follow our usual practice of deciding that question for ourselves, see, *e. g., Steamship Co.* v. *Joliffe,* 2 Wall. 450, 456–458 (1865). See generally *United*

*States* v. *Schooner Peggy*, 1 Cranch 103, 110 (1801) ("If, subsequent to the judgment [entered by a lower court], and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied."). Later cases took the same deferential approach to state courts when the intervening event consisted of one of our own opinions. See, *e. g.*, *State Tax Comm'n* v. *Van Cott*, 306 U. S. 511 (1939). By 1945, we could state that it was "[a] customary procedure" for the Court "to vacate the judgment of [a] state court where there has been a supervening event since its rendition which alters the basis upon which the judgment rests, and to remand the case so that the court from which it came might reconsider the question in light of the changed circumstances." *State Farm Mut. Automobile Ins. Co.* v. *Duel*, 324 U. S. 154, 161 (1945). Similarly, where a federal court of appeals' decision on a point of state law had been cast in doubt by an intervening state supreme court decision, it became our practice to vacate and remand so that the question could be decided by judges "familiar with the intricacies and trends of local law and practice." *Huddleston* v. *Dwyer*, 322 U. S. 232, 237 (1944).

The "intervening event" branch of our no-fault V&R practice has been extended to the seemingly analogous situation (though *not* one implicating the special needs of federalism) in which an intervening event (ordinarily a postjudgment decision of this Court) has cast doubt on the judgment rendered by a lower federal court or a state court concerning a *federal* question. See, *e. g.*, *Amer* v. *Superior Court of Cal., County of Los Angeles*, 334 U. S. 813 (1948); *Goldbaum* v. *United States*, 348 U. S. 905 (1955); *Henry* v. *City of Rock Hill*, 376 U. S. 776 (1964). This is undoubtedly the largest category of "GVRs" that now exists. See, *e. g.*, *Exxon Corp.* v. *Youell*, *post*, p. 801; *Kapoor* v. *United States*, *post*, p. 801; *Edmond* v. *United States*, *post*, p. 802; *Pacesetter Constr. Co.* v. *Carpenters 46 Northern Cal. Ctys. Conference Bd.*, *post*, p. 802; *Doctor's Associates, Inc.* v. *Casarotto*, 515 U. S. 1129

(1995); *Calamia* v. *Singletary*, 514 U. S. 1124 (1995). We regularly hold cases that involve the same issue as a case on which certiorari has been granted and plenary review is being conducted *in order that* (if appropriate) they may be "GVR'd" when the case is decided. More recently, we have indulged in the practice of vacating and remanding in light of a decision of ours that *preceded* the judgment in question, but by so little time that the lower court might have been unaware of it. See, *e. g.*, *Grier* v. *United States*, 419 U. S. 989 (1974). These applications of no-fault V&R have nothing to do with federalism, but they are appropriate to preserve the operational premise of a multitiered judicial system (viz., that lower courts will have the first opportunity to apply the governing law to the facts) and to avoid the unseemliness of holding judgments to be in error on the basis of law that did not exist when the judgments were rendered below. They thus serve the interests of efficiency and of concern for the dignity of state and lower federal tribunals.

An entirely separate branch of our no-fault V&R jurisprudence, but again one that originates in the special needs of federalism, pertains to decisions of state supreme courts that are ambiguous as to whether they rest on state-law or federal-law grounds. Rather than run the risk of improperly reversing a judgment based on state law, we adopted the practice of vacating and remanding so that the state court could make the reasons for its judgment clear. See, *e. g.*, *Minnesota* v. *National Tea Co.*, 309 U. S. 551 (1940); *Department of Mental Hygiene of Cal.* v. *Kirchner*, 380 U. S. 194 (1965).[2]

---

[2] In *Michigan* v. *Long*, 463 U. S. 1032 (1983), we largely supplanted this policy with the rule that state-court decisions discussing federal law will be presumed to be based on federal law unless the contrary is clear from the face of the opinion. *Id.*, at 1037–1044; see also *Arizona* v. *Evans*, 514 U. S. 1, 6–9 (1995) (reaffirming this approach). But cf. *Capital Cities Media, Inc.* v. *Toole*, 466 U. S. 378 (1984) (post-*Long* decision vacating and remanding for clarification of state supreme court decision rendered without opinion).

We have GVR'd with increasing frequency in recent years on the basis of suggestions or representations made by the Solicitor General. Some of these cases are nothing more than examples of the "intervening-event GVR" discussed above, the Solicitor General pointing out that a case or statute has intervened since the judgment below. See, *e. g.*, *Woods* v. *Durr*, 336 U. S. 941 (1949); *Altiere* v. *United States*, 382 U. S. 367 (1966). We have also announced no-fault GVR's, however, when there has been no intervening development other than the Solicitor General's confession of error in the judgment. That is a relatively new practice. As recently as 1942 a unanimous Court (two Justices not participating) wrote the following:

> "The public trust reposed in the law enforcement officers of the Government requires that they be quick to confess error when, in their opinion, a miscarriage of justice may result from their remaining silent. But such a confession does not relieve this Court of the performance of the judicial function. The considered judgment of the law enforcement officers that reversible error has been committed is entitled to great weight, but our judicial obligations compel us to examine independently the errors confessed. . . . Furthermore, our judgments are precedents, and the proper administration of the criminal law cannot be left merely to the stipulation of the parties. . . ." *Young* v. *United States*, 315 U. S. 257, 258–259 (1942).

Cf. *U. S. Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18 (1994) (setting aside of a valid judicial judgment should not turn upon agreement of the parties). Many of the early GVR's based upon the Government's confession of error appear not to have been no-fault V&R's at all, but rather summary decisions on the merits, with remand for further proceedings. See, *e. g.*, *Chiarella* v. *United States*, 341 U. S. 946 (1951) (*"[u]pon consideration of the record* and

the confession of error by the Solicitor General," remanding to the District Court for resentencing) (emphasis added); *Penner* v. *United States*, 399 U. S. 522 (1970) ("[o]n the basis of a confession of error by the Solicitor General and of an independent review of the record," remanding to the District Court "with instructions to dismiss the indictment").

Our recent practice, however, has been to remand in light of the confession of error without determining the merits, leaving it to the lower court to decide if the confession is correct. As late as 1981, the current Chief Justice, joined by Justice White, objected to this practice. See *Mariscal* v. *United States*, 449 U. S. 405, 407 (1981) (REHNQUIST, J., dissenting) ("I harbor serious doubt that our adversary system of justice is well served by . . . routinely vacating judgments which the Solicitor General questions without any independent examination of the merits on our own"). I agree with that position. The practice is by now well entrenched, however. See, *e. g., Reed* v. *United States*, 510 U. S. 1188 (1994); *Ramirez* v. *United States*, 510 U. S. 1103 (1994). It may be considered a separate category of no-fault V&R.

Finally (and most questionably) we have in very recent years GVR'd where the Solicitor General has *not* conceded error in the judgment below, but has merely acknowledged that the ground, or one of the grounds, on which the lower court relied was mistaken. See, *e. g., Alvarado* v. *United States*, 497 U. S. 543 (1990); *Chappell* v. *United States*, 494 U. S. 1075 (1990). That is in my view a mistaken practice, since we should not assume that a court of appeals has adopted a legal position only because the Government supported it. Four Justices now sitting on the Court have disapproved this sort of GVR. See *Alvarado, supra,* at 545 (REHNQUIST, C. J., joined by O'CONNOR, SCALIA, and KENNEDY, JJ., dissenting).[3]

---

[3] The Court misdescribes my position when it states that I would limit GVR's "based on confessions of error that do not purport to concede the whole case" to "cases in which the confession of error concerns a 'legal

Today's cases come within none of these categories of no-fault V&R, not even the questionable last one. In *Stutson* v. *United States, post,* p. 193, the decision "in light of" which we vacate the judgment and remand, *Pioneer Investment Services Co.* v. *Brunswick Associates Ltd. Partnership,* 507 U. S. 380 (1993), had been on the books for well more than a year before the Eleventh Circuit announced the judgment under review, and for almost two years before that court denied rehearing. Moreover, the parties *specifically argued* to the Court of Appeals the question whether *Pioneer* established the standard applicable to petitioner's claim of "excusable neglect" under Federal Rule of Appellate Procedure 4(b), with the United States disagreeing with petitioner and taking the position that *Pioneer* was *not* controlling. The Eleventh Circuit ruled against petitioner on the merits of his claim; its one-sentence order contained neither a reference to *Pioneer* nor any suggestion that the court viewed the case as turning on which party's proffered standard was applied.

The United States has now revised its legal position and—though it makes no suggestion that the Court of Appeals' judgment was incorrect—is of the view that *Pioneer does* establish the standard governing petitioner's claim. But the fact that the party who won below repudiates on certiorari its position on a particular point of law does not give rise to any "intervening," postjudgment factor that must be considered. The law is the law, whatever the parties, including the United States, may have argued. As described above,

---

point on which the lower court explicitly relied.'" *Ante,* at 171 (quoting *infra,* at 185). Both the text above and the sentence immediately following the phrase that the Court quotes from my dissent, see *ibid.,* make my position clear. The line of distinction I would draw—and the one long established in our practice—is between a respondent's concession of error *in the lower court's judgment* and a respondent's concession of error that goes not to the judgment but merely to an aspect of the reasoning below or of respondent's argument below.

we have sometimes GVR'd where the Government has, while still supporting the judgment in its favor, conceded the error of a legal point on which the lower court explicitly relied. As I have explained, see *supra,* at 183, in my view even that practice denies valid judgments the respect to which they are entitled. But the GVR in the present case goes still further. We do not know in this case whether the Eleventh Circuit even *agreed* with the Government's position that has now been repudiated; for all we know, the court *applied Pioneer* and found against petitioner under that standard. The judgment is declared invalid because the Eleventh Circuit *might* (or might not) have relied on a standard (non-*Pioneer*) that *might* (or might not) be wrong, that *might* (or might not) have affected the outcome, and that the Eleventh Circuit *might* (or might not) abandon (whether or not it is wrong) because the Government has now abandoned it. This seems to me beyond all reason.

The Court justifies its setting aside of the judgment on the ground that "we [do not] place an excessive burden on [the Eleventh Circuit], relative to [petitioner's] liberty and due process interests, by inviting it to clarify its ambiguous ruling." *Stutson, post,* at 196. Vacating for ambiguity may be justifiable, as I have noted, when the ambiguity calls into question our very power to take and decide the case, see *supra,* at 181, and n. 2. But where that power is (as it is here) beyond doubt, it seems to me quite improper to vacate merely in order to get a better idea of whether the case is "worth" granting full review. If this is appropriate with respect to court of appeals' summary dispositions of criminal cases, I see no reason why it is not appropriate with respect to criminal dispositions accompanied by opinions as well. Or, for that matter, why it is not appropriate for civil cases. "GVR'd for clarification of ——" should become a common form of order, drastically altering the role of this Court. In my view we have no power to make such a tutelary remand,

as to a schoolboy made to do his homework again.[4]   The Court insists that declining to remand for clarification would risk "immunizing summary dispositions . . . from our review," *Stutson, post,* at 196.   That is not so.   It is fully within our power to review this case, and any other case summarily decided below, by granting certiorari and proceeding to consider the merits; or indeed, where the circumstances warrant, to summarily reverse.   Cf. Hellman, "Granted, Vacated, and Remanded"—Shedding Light on a Dark Corner of Supreme Court Practice, 67 Judicature 389, 391–392 (1984) (noting that in the 1970's as the Court's GVR practice "increased far beyond what it had been in earlier years," its use of summary reversal based on intervening precedents decreased dramatically).

In No. 94–9323, the Court again GVR's because the Government has changed a legal position: The Commissioner of Social Security informs us that she now agrees with petitioner on a preliminary point of law that the Court of Appeals found in the Government's favor.   And here again, respondent does not concede that the judgment below was in error, for she "ha[s] not . . . reached a firm conclusion" as to her position on the subsequent point of law that will (if her recantation on the preliminary point is accepted) control the outcome of the case.   Brief for Respondent in No. 94–9323, p. 13.[5]   There is, however, a special factor in this second case: Respondent is an agency head, whose view on the legal point in question is in some circumstances entitled to defer-

_____

[4] *Netherland* v. *Tuggle,* 515 U. S. 951 (1995), upon which the Court relies, see *ante,* at 170, is not to the contrary.   That was not a "no-fault V&R," but a reversal of the lower court for abuse of discretion in its entry of a stay order.

[5] Because the Commissioner is not prepared to say that she disagrees with petitioner as to the proper disposition of this case, it is questionable whether any case or controversy subsists.   Quite apart from the other difficulties with the course the Court has chosen, it seems to me we should not permit the Commissioner to trouble the Fourth Circuit again until she makes up her mind on this issue.

ence, see *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). If it were clear that respondent's change in position were entitled to deference, I would have no problem with the GVR; the new position would then constitute an intervening postjudgment factor whose effect the Court of Appeals should be allowed to consider. But even if we allow deference to an agency view first expressed in pending litigation (as some think we should not, see Anthony, Which Agency Interpretations Should Bind Citizens and the Courts?, 7 Yale J. Reg. 1, 60–61 (1990); cf. Merrill, Judicial Deference to Executive Precedent, 101 Yale L. J. 969, 1023 (1992)), surely a decent concern for those litigating against the Government and for our lower court judges should induce us to disregard, for *Chevron* purposes, a litigating position *first expressed at the certiorari stage.* The United States is the most frequent, and hence the most calculating, of our litigants. If we accord deference in the circumstances here, we can expect the Government to take full advantage of the opportunity to wash out, on certiorari, disadvantageous positions it has embraced below; and we can expect it to focus less of its energy upon getting its position "right" in the courts of appeals.

The Court, however, thinks it unnecessary to decide the deference question. It is enough, as the Court sees it, that its summary review has led it to "believe that [the] agency interpretation is reasonably probably entitled to deference and potentially determinative." *Ante,* at 172. I do not agree. It seems to me our "intervening-event GVR's" should not be extended to the situation where (1) the intervening event consists of a party's going back on what it argued to the court of appeals, *and* (2) it is not even certain that the change in position is legally cognizable. That seems to me to accord inadequate respect to the work of our colleagues below. Moreover, it is not clear to me that the question before us (should an agency change of position at the certiorari stage be accorded deference?) *can even be reached*

by the Court of Appeals. Surely we do not expect the Court of Appeals to declare our vacation and remand invalid. Thus, the Court of Appeals will have before it the somewhat *different* question whether the agency change of position *before it* is entitled to deference. I suppose it may conclude that, *since* a change of position on certiorari is not entitled to deference, a change of position on a remand triggered by change of position on certiorari is not entitled to deference— but that would assuredly be a convoluted holding. The question of what is permissible on certiorari seems to me peculiarly within the domain of this Court. Since we are in doubt on the deference point in the present case, we should either deny the petition, or grant it and have the deference point argued.

The Court's failure to comprehend why it should make any difference that the Government's changed litigating position may not be entitled to deference, see *ante*, at 172–173, displays a lamentable lack of appreciation of the concept of adding insult to injury. It is disrespectful enough of a lower court to set its considered judgment aside because the Government has altered the playing field on appeal; it is downright insulting to do so when the Government's bait-and-switch performance *has not for a certainty altered any factor relevant to the decision.* In that situation, at least, we should let the Government live with the consequences of its fickleness or inattention. The Court claims that it would "defeat the purpose of GVR'ing" to determine the deference issue on the merits, since that issue is "based on a circumstance . . . that will not be present in any other case brought under the statute at issue." *Ibid.* That is true enough (barring the unlikely event that the Government in a later case under this very statute again switches its position at the certiorari stage). But the issue of whether *Chevron* deference should be accorded to a certiorari-stage switch of litigating position is not at all unique to the individual case or bound up with the underlying statute. It always arises, of

course, in an individual case involving a particular statute, as do most questions of law. But the issue itself is thoroughly generalizable, and of general importance. In any event, I do not urge that we determine the deference issue on the merits; my vote in these cases is to deny the petitions. Finally, I must remark upon the Court's assertion that we issued "just such a GVR order last Term, without recorded dissent," *ante*, at 173, citing *Schmidt* v. *Espy*, 513 U. S. 801 (1994): It is not customary, but quite rare, to *record* dissents from grants of certiorari, including GVR's. It would be wrong to conclude from the unsigned order in *Schmidt* that the vote to GVR was unanimous, or even close to unanimous. Thus, *Schmidt* does not demonstrate that bait-and-switch-deference GVR's are an accepted practice; but the fact that *Schmidt* was apparently the first-ever such GVR, combined with the fact that the Government is back one Term later for another helping, demonstrates the accuracy of my prediction that the Solicitor General will be quick to take advantage of this new indulgence.

What is more momentous than the Court's judgments in the particular cases before us—each of which extends our prior practice just a little bit—is its expansive expression of the authority that supports those judgments. It acknowledges, to begin with, no constitutional limitation on our power to vacate lower court orders properly brought before us. *Ante*, at 166. This presumably means that the constitutional grant of "appellate Jurisdiction" over "Cases . . . arising under [the] Constitution [and] Laws of the United States," Art. III, § 2, empowers the Court to vacate a state supreme court judgment, and remand the case, because it finds the opinion, though arguably correct, incomplete and unworkmanlike; or because it observes that there has been a postjudgment change in the personnel of the state supreme court, and wishes to give the new state justices a shot at the case. I think that is not so. When the Constitution divides our jurisdiction into "original Jurisdiction" and "appellate

Jurisdiction," I think it conveys, with respect to the latter, the traditional accoutrements of appellate power. There doubtless is room for some innovation, particularly such as may be necessary to adapt to a novel system of federalism; but the innovation cannot be limitless without altering the nature of the power conferred.

Not only does the Court reject any constitutional limitation upon its power to vacate; it is unwilling to submit to any prudential constraint as well. Even while acknowledging the potential for "unfair[ness] or manipulat[ion]" and professing to agree that "our GVR power should be exercised sparingly," *ante*, at 168, 173, the Court commits to no standard that will control that power, other than that cloak for all excesses, "the equities," *ante*, at 168; see *ante*, at 173, 174, 175; *post*, at 196. We may, as the Court now pronounces, set aside valid judgments not merely when they are wrong, not merely when intervening events require that someone (either the lower court or we) reconsider them on new facts or under new legal criteria, not merely when it is ambiguous whether we have power to review them, not merely when the United States concedes that the judgment below (or one of the points of law relied upon below, or even one of the points of law *possibly* relied upon below) is wrong; but whenever there is "a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration." *Ante*, at 167. The power to "revis[e] and correc[t]" for error, *Marbury* v. *Madison*, 1 Cranch 137, 175 (1803), has become a power to void for suspicion. Comparing the modest origins of the Court's no-fault V&R policy with today's expansive *dénouement* should make even the most Pollyannish reformer believe in camel's noses, wedges, and slippery slopes.

The Court justifies its approach on the ground that it "alleviates the potential for unequal treatment that is inherent in our inability to grant plenary review of all pending cases

raising similar issues." *Ante,* at 167 (internal quotation marks omitted). I do not see how it can promote equal treatment to announce a practice that we cannot possibly pursue in every case. If we were to plumb the "equities" and ponder the "errors" for all the petitions that come before us—if we were to conduct, for example, in all cases involving summary decisions, today's balancing of the "burden" to the Court of Appeals against the litigant's "interests" in having clarification of the ruling, see *Stutson, post,* at 196, or today's calculation of "the overall probabilities and equities," *ante,* at 173—we would have no time left for the cases we grant to consider on the merits. Of course we do not *purport* to conduct such inquiries, not even the basic one of whether the decision below is probably in "error"—which is why we insist that our denial of certiorari does not suggest a view on the merits, see, *e. g., Teague* v. *Lane,* 489 U. S. 288, 296 (1989); *Singleton* v. *Commissioner,* 439 U. S. 942 (1978) (STEVENS, J., respecting denial of petition for writ of certiorari). Moreover, even if we tried applying the Court's "totality-of-the-circumstances" evaluation to all the petitions coming before us, we would be unlikely to achieve equal treatment. Such a plastic criterion is liable to produce inconsistent results in any series of decisions; it is virtually *guaranteed* to do so in a series of decisions made without benefit of adversary presentation (whether we should GVR is rarely briefed, much less argued—as it has not been here) and announced without accompaniment of a judicial opinion (we almost never give reasons as the Court has done today). The need to afford equal treatment argues precisely *against* the "totality-of-the-circumstances" approach embraced by the Court, and in favor of a more modest but standardized GVR practice.

Henceforth, I shall vote for an order granting certiorari, vacating the judgment below without determination of the merits, and remanding for further consideration, only (1) where an intervening factor has arisen that has a legal bear-

ing upon the decision, (2) where, in a context not governed by *Michigan* v. *Long,* 463 U. S. 1032 (1983), clarification of the opinion below is needed to assure our jurisdiction, and (3) (in acknowledgment of established practice, though not necessarily in agreement with its validity) where the respondent or appellee confesses error in the judgment below. (I shall not necessarily note my dissent from GVR's where those conditions do not exist.) As I have discussed, neither of the present cases meets these standards. Accordingly, I respectfully dissent from today's orders and would deny both petitions.