# Supreme Court of Texas

No. 24-0023

Jonathan Timothy Noyes,

*Petitioner*,

v.

The State of Texas for the Protection of Samantha Jo Voges,

*Respondent*

On Petition for Review from the
Court of Appeals for the Third District of Texas

JUSTICE HAWKINS, joined by Justice Young and Justice Sullivan, concurring.

The trial court imposed on Petitioner Jonathan Noyes a lifetime protective order that permanently prohibits him from possessing firearms. It did so after finding reasonable grounds to believe that Noyes had engaged in criminal stalking against a former romantic partner, but without finding that Noyes poses a credible threat to her (or anyone else's) physical safety. Does that order offend Noyes's fundamental individual right to keep and bear arms as protected by both the U.S. and Texas Constitutions?

In late 2023, the court of appeals held "no." But a few months later, in mid-2024, the U.S. Supreme Court issued a new decision charting the constitutional boundaries of firearm restrictions imposed through protective orders. *United States v. Rahimi*, 602 U.S. 680 (2024). The U.S. Supreme Court concluded: "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 702.

Noyes now argues that when *Rahimi* permitted a *temporary* disarmament on the basis of a threat-to-safety finding, it implicitly prohibited the trial court's order here—a *permanent* disarmament with no such finding. Today, the Court grants his petition, vacates the court of appeals' judgment, and remands this case for the court of appeals to assess that argument in the first instance. Mindful that "the law is typically better served when the lower courts review a legal issue before this Court does," *Rattray v. City of Brownsville*, 662 S.W.3d 860, 869-70 (Tex. 2023), I concur.

I write separately to highlight why this case is well suited to the GVR mechanism—that is, a brief opinion of the Court that *grants* the petition for review, *vacates* the lower court judgment, and *remands* the case to a lower court in light of some intervening circumstance. When used correctly, GVRs can advance the law and conserve party and judicial resources. Although our Court has rarely issued GVRs, I would encourage litigants to request them when appropriate—especially in light of our recent modifications to Texas Rule of Appellate Procedure 53.

# I

After his romantic partner ended their tumultuous dating relationship, Noyes sent her over 1,500 text messages and emails. (For all the troubling details, *see* JUSTICE SULLIVAN's concurrence, which I join, *ante* at 4-6.) She filed multiple police reports. Following an investigation, the State obtained an arrest warrant, filed criminal charges, and sought a protective order ex parte under Article 7B, Subchapter A of our Code of Criminal Procedure.

The trial court convened a bench hearing, at which it found reasonable grounds to believe that Noyes had engaged in criminal stalking. The trial court did not find that Noyes posed a credible threat to the physical safety of his former romantic partner or anyone else. Nor did it find that Noyes's conduct involved family violence, threats of bodily harm, or any use or threatened use of a weapon. The State's own prosecutor told the trial court: "There is not a future threat element on this."

Nevertheless, the trial court issued a permanent protective order prohibiting Noyes from possessing any firearm for the remainder of his life. The court of appeals affirmed, holding that Subchapter A requires only a finding that "there are reasonable grounds to believe that the applicant is the victim" of a qualifying offense and that "[n]o additional showings beyond status as a crime victim are required to obtain the order." ___ S.W.3d ___, 2023 WL 8102025, at *7 (Tex. App.—Austin Nov. 22, 2023) (citations omitted).

Six months later, the U.S. Supreme Court decided *Rahimi*. That case, like this one, involved a protective order arising from a romantic

3

relationship. Zackey Rahimi dragged his girlfriend, C.M., into his car and fired a gun after he noticed a bystander witnessed the assault. *Rahimi*, 602 U.S. at 686. He later threatened to shoot C.M. if she reported him. *Id.* The trial court entered a protective order disarming Rahimi that was specifically tied to its finding that he posed a credible threat to C.M.'s physical safety. *Id.* at 687. In the two months that followed, Rahimi was involved in five additional shootings. *Id.* He was indicted under 18 U.S.C. § 922(g)(8), the federal statute prohibiting firearm possession by someone subject to a qualifying domestic-violence restraining order. *Id.* at 688.

The U.S. Supreme Court held that the protective order against Rahimi did not violate the Second Amendment. *Id.* Its reasoning highlighted two key considerations. First, Rahimi's underlying protective order contained a judicial finding that he "represented a credible threat to the physical safety of" an intimate partner. *Id.* at 689 (citation and internal quotations omitted). The Court connected this to a long Anglo-American tradition of surety laws and "going armed" laws, under which individuals who were found to pose a specific danger to others could be temporarily stripped of their ability to carry weapons. *Id.* at 698-700. The Court explained that the historical analogues all shared a common feature: they applied to individuals who had been specifically found to be dangerous to identifiable others. *Id.* at 698. The individualized dangerousness finding, in other words, was a critical consideration in finding the order consistent with the Second Amendment.

4

Second, the disarmament was temporary. The protective order in Rahimi's own case was limited to one to two years after his release from prison. *See* TEX. FAM. CODE § 85.025(c). The Court emphasized that the historical surety and recognizance laws similarly imposed time-limited restrictions that expired when the danger had passed. *Rahimi*, 602 U.S. at 699. The temporary nature of the restriction was an essential piece of the relevant history and tradition. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022).

Invoking *Rahimi*, Noyes now seeks our review.

## II

Texas Rule of Appellate Procedure 60.2(f) authorizes the GVR mechanism: we may "vacate the lower court's judgment and remand the case for further proceedings in light of changes in the law." That rule effectuates sound prudential considerations. A GVR

> conserves the scarce resources of this Court that might otherwise be expended on plenary consideration, assists the court below by flagging a particular issue that it does not appear to have fully considered, assists this Court by procuring the benefit of the lower court's insight before we rule on the merits, and alleviates the "[p]otential for unequal treatment" that is inherent in our inability to grant plenary review of all pending cases raising similar issues[.]

*Lawrence ex rel. Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (first alteration in original) (citation omitted).

In my view, this is a textbook case for a GVR. First, as the above discussion shows, *Rahimi* constitutes a significant intervening change in the governing constitutional framework. Before *Rahimi*, no decision

of the U.S. Supreme Court had squarely addressed whether, and under what conditions, a protective-order-based firearm prohibition satisfies the Second Amendment under the history-and-tradition test of *Bruen*. *Rahimi* now provides that framework—and its emphasis on individualized dangerousness findings and temporal limitations casts substantial doubt on the validity of the order below.

The court of appeals had no meaningful opportunity to apply *Rahimi*. Its opinion on rehearing was issued before *Rahimi* was decided. Its analysis of Petitioner's Second Amendment claims was confined to a footnote disposing of those claims on preservation grounds. (As the Court's per curiam GVR notes, *ante* at 2, Noyes sufficiently preserved his Second Amendment and Arms Clause challenges.) The court never reached the merits of whether a lifetime disarmament order, entered without a finding of dangerousness to another person, comports with the Second Amendment as construed in *Rahimi*. A remand would allow the intermediate court to address that question in the first instance.

Finally, there is a reasonable probability that the decision below rests upon a premise the lower court would reject if given the opportunity to reconsider. *See Lawrence*, 516 U.S. at 167. The court of appeals held that Subchapter A requires "[n]o additional showings beyond status as a crime victim" to support a lifetime firearms prohibition. ___ S.W.3d ___, 2023 WL 8102025, at *7 (citation omitted). But *Rahimi* indicates that the Second Amendment requires more, including a finding that the individual poses a credible threat to the physical safety of another, and a limitation on the order's duration commensurate with that threat.

This case may return to us one day. If it does, we will benefit from the lower court's careful analysis of the above considerations. *See Rattray*, 662 S.W.3d at 869-70.

### III

Despite their obvious virtues—and our federal counterpart's robust GVR practice ranging anywhere from a few dozen to a few hundred in a given term[1]—our Court has issued surprisingly few GVRs.[2] I believe our State's judicial system would benefit from more petition-stage per curiam decisions or other orders that direct lower courts to reconsider their judgments in light of intervening developments. *See Lawrence*, 516 U.S. at 167. Such orders promote efficiency, as they allow the court of appeals, which is already intimately familiar with the case, to reevaluate its judgment in light of new authority. *Id*. They save parties money, as the briefing on remand in the court of appeals often

---

[1] *Compare* 125 S. Ct. 984-1115 (2005) (order GVRing nearly 400 cases in one day "in light of *United States v. Booker*") *with* 143 S. Ct. 70-2686 (2022-2023) (orders GVRing approximately 50 cases throughout entire 2022 term).

[2] I count just over a dozen true GVRs in our Court's annals, most of which occurred long ago, *see, e.g.*, *In re N.K.*, 89 S.W.3d 29, 30 (Tex. 2002), but at least some of which occurred more recently, *see, e.g.*, *Karli v. Wilson*, No. 25-1085, ___ S.W.3d ___, slip op. at 2 (Tex. May 8, 2026). In addition, we have occasionally issued orders that resemble certain aspects of GVRs, directing lower courts to render judgment not "in light of changes of the law," but pursuant to a settlement agreement effectuated by the parties. *E.g.*, Orders of the Supreme Court of Texas, Nos. 24-0206, 24-0954, 24-0987, 25-0063 (Tex. May 16, 2025). And, of course, we have issued per curiam decisions that have functioned as GVRs after imposing on parties the substantial cost of full merits briefing. *See, e.g.*, *Thomson v. Hoffman*, 674 S.W.3d 927 (Tex. 2023). Plenty of other per curiam decisions were not but could have been GVRs issued before full merits briefing.

can be limited to the new development, and the resulting decision may not require extensive further review. And they ensure that when our Court grants review, all the relevant arguments have already been vetted and passed on by the lower court in the first instance. I hope that litigants will alert us when a GVR is warranted.

So when exactly is a GVR warranted? Rule 60.2(f) identifies, but does not define, "changes in the law." Undoubtedly, as here, an intervening judicial decision clarifying the analytical framework for a constitutional challenge justifies a GVR. But our rule is not limited to these circumstances. As a matter of federal practice, the U.S. Supreme Court has "GVR'd in light of a wide range of developments, including . . . new federal statutes, administrative reinterpretations of federal statutes, new state statutes, changed factual circumstances, and confessions of error or other positions newly taken by the Solicitor General, and state attorneys general." *Lawrence*, 516 U.S. at 166-67 (citations omitted). Most of those situations present clear "changes in the law," and many petitions for review presenting one or more of these circumstances will be appropriate candidates for a GVR. (Others may not. It is not obvious to me, for example, whether a confession of error by the State is a "change in the law.")[3]

---

[3] It is appropriate to consider the U.S. Supreme Court's practice in analyzing our Rule 60.2(f). Indeed, this Court adopted our GVR rule to "codify current practice" just one year after the U.S. Supreme Court confirmed the benefit of the GVR mechanism and its own capacity to issue such orders in *Lawrence*. *See* Ord. Approving Revisions to the Texas Rules of Appellate Procedure, Misc. Docket No. 97-9056 (Tex. Mar. 20, 1997); 1997 Comment to TEX. R. APP. P. 60.

Of course, the existence of some intervening development will not always merit a GVR, and our colleagues on the U.S. Supreme Court have pointed out that the GVR mechanism can be misused and abused. *See Lawrence*, 516 U.S. at 191-92 (Scalia, J., dissenting) (arguing that a GVR is inappropriate unless "an intervening factor has arisen that has a legal bearing upon the decision"). Reasonable minds may differ about whether any particular intervening development is significant enough to justify a do-over in the court of appeals. *See Grzegorczyk v. United States*, 142 S. Ct. 2580, 2581 (2022) (mem.) (Sotomayor, J., dissenting from the denial of GVR); *see generally* Aaron-Andrew P. Bruhl, *The Supreme Court's Controversial GVRs—and an Alternative*, 107 MICH. L. REV. 711 (2009). At a minimum, we should require "a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the litigation." *Lawrence*, 516 U.S. at 167; *cf. Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's Lond.*, 327 S.W.3d 118, 136 (Tex. 2010) ("We see no need to remand the case to allow the court of appeals to consider an argument it has effectively already considered."); *In re Doe 4*, 19 S.W.3d 322, 331 (Tex. 2000) (Hecht, J., dissenting) ("It is one thing for the Court to remand a case for further consideration in light of developments in the law that may not have been anticipated, but it is another thing altogether to remand when a party has made no attempt to adduce even minimal proof."). The fact that there will be some gray areas and close calls should not dissuade parties from

9

invoking in good faith the possibility of a GVR when there are reasonable grounds to do so.

I close with a suggestion to the bar. Litigants have always been free to raise Rule 60.2(f) and request a GVR in light of changes in the law. But under our new approach to petitions for review, where we grant review before receiving merits briefing, it is critical that litigants alert us *at the petition stage*—as soon as possible—that a GVR is warranted. *See generally* TEX. R. APP. P. 53 & cmts. When the petitioner or respondent is aware of an intervening development that creates a reasonable probability that the decision below would come out differently on reconsideration, he should bring it to our attention immediately. Not every such development will merit a GVR. But when one does, we should dispose of it swiftly on the petition, before saddling our judicial system with the costs, burdens, and year-long delay of full merits briefing and plenary review. *See generally Megatel C90-2, Inc. v. Bank of Utah*, 712 S.W.3d 625, 625 n.2 (Tex. 2025) (Sullivan, J., concurring) (illustrating such costs and burdens).

* * *

For these reasons, I concur in the GVR.

Kyle D. Hawkins
Justice

**OPINION FILED:** May 15, 2026

10