[Cite as *State v. Brown*, 2025-Ohio-8.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240230 |
| | | TRIAL NO. B-2306014 |
| Plaintiff-Appellant, | : | |
| vs. | : | |
| | | *OPINION* |
| KENDALL BROWN, | : | |
| Defendant-Appellee. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: January 3, 2025

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Norbert Wessels*, Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Connor Reilly*, for Defendant-Appellee.

**BERGERON, Judge.**

{¶1} This case concerns the State's power to disarm one of its citizens based solely on the fact that he is under indictment. After defendant-appellee Kendall Brown was indicted for a robbery but released on bail, officers discovered a gun in his home. The State then charged Mr. Brown anew, this time with possessing a firearm while under a disability—specifically, possessing a weapon while under indictment for a felony offense of violence. Mr. Brown moved to dismiss the new indictment, and shortly thereafter, the court dismissed his robbery indictment. He thus maintained, and the trial court agreed, that the Second Amendment to the United States Constitution bars a prosecution like his. The State now appeals, asking us to resolve whether the Constitution prohibits Ohio from disarming an individual based solely on his indictment for a felony offense like robbery. On the facts and history presented in this case, we hold it does. We therefore affirm the trial court's judgment dismissing Mr. Brown's indictment.

I.

{¶2} The factual record in this case is sparse but important to understanding the as-applied constitutional challenge at hand. In 2023, a grand jury indicted Mr. Brown on one count of robbery pursuant to R.C. 2911.01(A)(2). The court released Mr. Brown on bond with an electronic monitoring unit ("EMU") ankle monitor, but it did not place any restrictions on his ability to possess a firearm. During a home visit by the EMU team, they located a loaded firearm in his apartment. This discovery spawned a new indictment pursuant to R.C. 2923.13(A)(2) for having a weapon under a disability.

{¶3} The State's robbery case against Mr. Brown eventually collapsed, which led to the dismissal of those charges against him. But since the weapons under a

disability case was still at play, Mr. Brown moved to dismiss his indictment, raising an as-applied challenge to the statute, relying heavily on the United States Supreme Court's recent decision in *N.Y. State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022). The trial court, surveying the record at hand, determined that the State had not met its burden under *Bruen* to present a historical record to support the infringement upon Mr. Brown's presumptively constitutional conduct.

{¶4} The State now appeals, presenting a single assignment of error.

## II.

{¶5} In its sole assignment of error, the State challenges the trial court's finding R.C. 2923.13(A)(2) unconstitutional as applied and dismissing the charge against Mr. Brown. Because the trial court dismissed the indictment for purely legal reasons, we review its decision de novo. *See State v. Thacker*, 2024-Ohio-5835, ¶ 7 (1st Dist.), citing *State v. Troisi*, 2022-Ohio-3582, ¶ 17; *State v. King*, 2024-Ohio-4585, ¶ 14 (8th Dist.). Because the trial court held the statute unconstitutional not on its face, but only as applied to Mr. Brown in this case, our analysis must take into consideration "the particular context in which" he acted. (Cleaned up.) *Wymsylo v. Bartec, Inc.*, 2012-Ohio-2187, ¶ 22.

### A.

{¶6} Since 2008, the United States Supreme Court has held that the Second Amendment preserves an individual right to keep and bear arms. *Dist. of Columbia v. Heller*, 554 U.S. 570, 595 (2008); U.S. Const., amend. II. The Fourteenth Amendment renders that guarantee enforceable against state governments no less than the federal. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

{¶7} But the trigger for this case was an even more recent methodological shift. In 2022, the Supreme Court held that Second Amendment challenges should be

3

evaluated under what came to be known as the "text, history, and tradition" test. *See Bruen*, 597 U.S. 1. So, when a litigant asserts that a statute infringes upon his right to bear arms, courts must now consider (1) whether "the Second Amendment's plain text covers an individual's conduct," and, if so, (2) whether that "regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. Once a court answers the first question in the affirmative, the statute is presumed unconstitutional, and the State must shoulder the burden of mustering analogous historical laws to answer the second. *Id.* at 24.

**{¶8}** Mr. Brown challenges the application of R.C. 2923.13(A)(2). We recently had occasion to consider a Second Amendment challenge to a different provision of the same statute in *Thacker*, 2024-Ohio-5835 (1st Dist.). In that case we noted that disarming statutes generally fall into one of two camps (1) "universal" bans and (2) "categorical" bans. *Id.* at ¶ 16-17. The former camp includes statutes that operate on every citizen's right to bear arms equally—as the laws in *Heller*, *McDonald*, and *Bruen* did. *See Heller* at 635 (striking down blanket prohibition on owning handguns in the home); *McDonald* at 750 (same); *United States v. Rahimi*, 602 U.S. 680, 698 (2024) (describing "the regulation struck down in *Bruen*" as "broadly restrict[ing] arms use by the public generally").[1]

**{¶9}** The latter, "categorical" camp includes more targeted laws that disarm only certain portions of the public. The statute at hand, R.C. 2923.13, helps illustrate the point. Subsection (A) describes five categories of persons who, "[u]nless relieved from disability under operation of law or legal process," may not "knowingly acquire,

---

[1] The dissent suggests that we remand in light of *United States v. Rahimi*, 602 U.S. 680 (2024) but *Rahimi* was handed down in the middle of briefing this appeal and the State thoroughly addressed it in its reply brief. Neither party requested a remand for further record development in light of *Rahimi*, and we sit in as good a spot as the trial court to evaluate its impact.

have, carry, or use any firearm." The categories include "fugitive[s] from justice," individuals suffering "from drug dependency" or "chronic alcoholism," and those who have "been committed to a mental institution," among others. R.C. 2923.13(A)(1), (4), and (5). At issue here is the provision disarming the class of persons "under indictment for . . . any felony offense of violence," R.C. 2923.13(A)(2), a phrase defined to include any "violation of section . . . 2911.02" of the Revised Code. *See* R.C. 2901.01(A)(9)(a).

**{¶10}** In *Thacker*, we provided a framework for assessing the constitutionality of such a categorical disarmament. After an extensive discussion of recent Second Amendment cases and historical materials, we noted that the State could justify a categorical disarmament *either* (1) by pointing to a historical pattern of relevantly and specifically similar disarming statutes, *Thacker* at ¶ 56, *or* (2) by showing that it falls within our nation's "longstanding practice" of allowing legislatures to "disarm[] those they determine to be dangerous," *id.* at ¶ 54.

**{¶11}** While this latter category allows the State room to work, it does not permit the State to simply cry "dangerous" and prevail. "Although the legislature may make some broad determinations" in passing categorical bans, courts cannot "accept those determinations blindly, as 'complete deference to legislative line-drawing would allow legislatures to define away a fundamental right.'" *Thacker,* 2024-Ohio-5835 at ¶ 49 (1st Dist.), quoting *United States v. Williams*, 113 F.4th 637, 660 (6th Cir. 2024). Thus, we explained, a court assessing a danger-based categorical disarmament should consider "(1) whether the class of persons disarmed can reasonably be presumed dangerous with a firearm, and (2) whether the duration of the disarmament is realistically tailored to the danger persons in that class pose." *Id.* at ¶ 54.

B.

{¶12} With this framework in mind, we turn to the case and statute before us. Mr. Brown's statutory disability stemmed from his indictment for robbery under R.C. 2911.01(A)(2). Robbery constitutes a felony, and an "offense of violence," as that term is defined in R.C. 2901.01(A)(9).

{¶13} At the time of his indictment on the weapons charge at issue here, Mr. Brown had not been convicted of the robbery charge and had been released on bond pending trial. As a condition of his bond, he was subject to electronic monitoring. The State did not seek, nor did the trial court require, Mr. Brown's disarmament as a condition of his release on bond (but either certainly could have). The weapon at issue in this case was found when officers from the Hamilton County EMU searched Mr. Brown's apartment.

{¶14} Our task, then, is to determine whether, under these facts, the State may render Mr. Brown's gun possession a crime.

{¶15} First, we must ask whether the Second Amendment's plain text covers the conduct at issue here. But that inquiry need not detain us long, because the State concedes the point. Mr. Brown's conduct, therefore, was presumptively protected by the Constitution, and we proceed to step two.

{¶16} Second, we ask whether the disarmament imposed by R.C. 2923.13(A)(2), as applied in this case, falls within our Nation's historical tradition of firearms regulation. Specifically, we consider whether the State has provided historical evidence demonstrating general acceptance of a regulation like the one applied here from at or around the time of the ratification of the Second Amendment.

1.

{¶17} We begin the historical inquiry by considering the State's evidence that

our Nation has a specific historical tradition of disarming those like Mr. Brown.

{¶18} The State struggles in this regard because it must admit that, like in *Thacker*, Ohio's application of R.C. 2923.13(A)(2) to Mr. Brown renders it "an 'outlier' among its sister states." *See Thacker*, 2024-Ohio-5835, at ¶ 103 (1st Dist.), quoting *Bruen*, 597 U.S. at 79 (Kavanaugh, J., concurring). In its decision below, the trial court cited to one of its earlier opinions where it observed that the parties found only *two other states* with laws comparable to the application of R.C. 2923.13(A)(2) challenged here: Hawaii and Washington. *See* Haw.Rev.Stat. 134-7(b); Wash.Rev.Code 9.41.040(2)(a)(vi). The State does not quibble with this conclusion, and our own research seems to validate it.

{¶19} And, it must be emphasized, Ohio only decided to start barring individuals under indictment from firearm possession about 50 years ago. *See State v. Carnes*, 2018-Ohio-3256, ¶ 16 (noting that R.C. 2923.13 was enacted in 1972). This certainly does not represent a long-standing tradition, even in our own State.

{¶20} To be sure, "the 'outlier' character of Ohio's law in this area does not, itself, render it unconstitutional." *See Thacker* at ¶ 104. But it does raise some alarm bells. Presumably, all states share Ohio's concern that weapons in the hands of those believed to have committed violent crimes pose a threat to public safety. Yet, despite the universality of this perspective, the overwhelming majority of Ohio's sister states have chosen not to enact a law like Ohio's—perhaps feeling that such a law would cross some constitutional line, or else that they were fully capable of managing the danger through individualized disarmament determinations and/or more limited encroachments on the right to bear arms, such as prohibitions on purchase, transport, or public carry. The State's attempt to prosecute Mr. Brown, therefore, is not only unsupported by the State's historical evidence, "it also bucks the general consensus

7

among modern legislatures." *Id.*

{¶21} In light of Ohio's experience, perhaps it's not surprising that the State offers no evidence of any specific historical tradition, dating back either to the founding or reconstruction era, of categorically disarming individuals based solely on the fact of their indictment—either in general, for violent crimes, or for robbery in particular. The State identifies no statute in this State's history that resembles R.C. 2923.13(A)(2), nor does it point to any common-law tradition deeming it a crime to be armed while under indictment. The absence of such evidence, while not fatal to the State's appeal, renders its task more difficult.

{¶22} Instead, the State tries to broaden the aperture, insisting that felonious behavior justifies a determination that someone cannot be trusted with firearms. In other words, the State suggests that history and tradition grant the states the power to disarm any person found to have engaged in felony conduct.

{¶23} But this argument suffers from two flaws. The first is that, as in *Thacker*, the State provides no clear historical evidence that felons *were* disarmed at the founding. *See Thacker*, 2024-Ohio-5835, at ¶ 65 (1st Dist.). In its brief, the State cites several historical state laws, and points to a federal district court decision citing more, *United States v. Omar*, 2023 U.S. Dist. LEXIS 203650, at *10 (S.D. Ohio Nov. 14, 2023). But not one of the cited statutes actually *disarmed* a person because of his felonious conduct.

{¶24} Rather, these statutes cited by the State generally evince a historical tradition permitting the *execution* of convicted felons or the forfeiture of their assets. As in *Thacker*, the State rests its categorical-felon-disarmament theory on the rationale that, "because many felonies—including some nonviolent offenses—were punished by death in 1791, the government must have been able to inflict the lesser

punishment of disarmament for such crimes." *See Thacker* at ¶ 66. Although we continue to find it "difficult to understand" how laws exercising the State's power to inflict death or total asset forfeiture on felons are "relevantly similar" to Ohio's weapons-under-a-disability statute, we once again have no reason to resolve the issue of categorical felon-disarmament in this case. *See id.* at ¶ 67.

{¶25} Even if, as the State suggests, founding-era governments possessed the untrammeled power to disarm individuals convicted of a felony, Mr. Brown was not such a felon. He had only been *indicted* for a felony offense when the State charged him with possessing a weapon under a disability. As we explained in *Thacker*, any categorical felon-disarmament rule would necessarily rest on the disarmed individual's conviction. And a felony conviction, to the founding generation, meant at least two things: (1) trial by jury, and (2) a heightened burden of proof, understood today as proof beyond a reasonable doubt. *See United States v. Gaudin*, 515 U.S. 506, 509-510 (1995) (describing how the Fifth and Sixth Amendments "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt"); *accord Apprendi v. New Jersey*, 530 U.S. 466, 477-478 (2000).

{¶26} In *Thacker*, we explained the relationship between a felony conviction and the right to trial by jury. *See Thacker*, 2024-Ohio-5835, at ¶ 71 (1st Dist.). We recounted how founding-era voices deemed juries to be "'more necessary than representatives in the legislature' in ensuring liberty," and how, in the Declaration of Independence, the colonists included the deprivation of jury trials among their grievances with the crown. *Id.*, quoting *"A Farmer" in* 1 *Debates on the Federal Judiciary: A Documentary History* 34, 34 (Bruce A. Ragsdale Ed., Fed. Judicial Ctr. 2013), and DECLARATION OF INDEPENDENCE, July 4, 1776. And we noted that "the right

to a criminal jury was the 'only right secured in all state constitutions penned between 1776 and 1787.'" *Id.*, quoting Amar, Foreword, *Sixth Amendment First Principles*, 84 Yale L.J. 641, 681 (1996); *accord Duncan v. Louisiana*, 391 U.S. 145, 153 (1968).

{¶27} In addition to the jury, criminal proceedings since the founding have also been defined by the high burden of proof imposed upon the government—a standard that we now describe as proof beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970) (holding "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt").

{¶28} To those alive in the founding era, therefore, a felony conviction came from a jury applying a heightened standard of proof. Only with such procedural safeguards could the State lawfully impose a sentence of death or other punishment. Thus, any argument that the State may today disarm all those whom it could execute at the founding presupposes that the disarmed individuals received comparable protections.

{¶29} At the time when authorities discovered his weapon, Mr. Brown had received no jury trial on his robbery charge—only a one-sided grand-jury proceeding and subsequent bond hearing before a judge. Nor had he been adjudicated guilty under a reasonable-doubt standard; the grand jury only needed probable cause to indict, a threshold far lower than that necessary to convict. *See State ex rel. Lipschutz v. Shoemaker*, 49 Ohio St.3d 88, 90 (1990) ("An indictment is a mere accusation, but it indicates that a grand jury had found probable cause to believe in the truth of the accusation."); *Locke v. United States*, 11 U.S. (7 Cranch) 339, 348 (1813) (Marshall, C.J.) ("the term 'probable cause,' according to its usual acceptation, means less than evidence which would justify condemnation"); *Illinois v. Gates*, 462 U.S. 213, 235 (1983), quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969) ("'[O]nly the

probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'"). In fact, the robbery indictment that created Mr. Brown's disability was ultimately dismissed and the record expunged. Mr. Brown, therefore, was not a felon as the founders would have understood the concept and he would not have been subject to any per se felon disarmament.

{¶30} An indictment is a one-sided preliminary allegation of criminal conduct. The State, quite simply, fails to demonstrate any specific tradition in this country of disarming those *indicted* for crimes of violence. And an indictment on probable cause cannot be reasonably analogized to a conviction by a jury persuaded of guilt beyond a reasonable doubt. The State certainly does not substantiate disarming individuals afforded so little in terms of procedural protections. We therefore proceed to consider the State's broader, dangerousness-based arguments.

2.

{¶31} The State next seeks to place this case within our Nation's tradition of disarming those determined to be dangerous. We, like numerous other courts, have recognized such a historical tradition. *See Thacker*, 2024-Ohio-5835, at ¶ 44 (1st Dist.) ("our nation has a 'history and tradition' of disarming individuals who pose a particular danger with a firearm"); *Rahimi*, 602 U.S. at 690 ("Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms."); *Williams*, 113 F.4th at 657 ("governments in England and colonial America long disarmed groups that they deemed to be dangerous").

{¶32} But this tradition is not a blank check. In *Rahimi*, the Supreme Court accepted that the categorical weapons ban imposed under 18 U.S.C. 922(g)(8) was such a traditional danger-based disarmament, but emphasized the tailored

11

characteristics of both the modern statute and the government's historical analogues. *See Rahimi* at 699-700. First, that statute required tailored, individualized determinations that an individual posed a danger before disarming them. *Id.* at 699; *Thacker* at ¶ 23. Second, the disarmament was temporally limited. *Rahimi* at 699; *Thacker* at ¶ 24. And third, the disarmed individual received clear notice prior to the imposition of criminal sanctions. *Rahimi* at 688; *Thacker* at ¶ 25.

**{¶33}** This court, in *Thacker*, found R.C. 2923.13(A)(3) lacking in the second category, at least as applied to a defendant previously adjudicated delinquent as a juvenile for a nonviolent offense. *Thacker* at ¶ 97-100. The State's application of its law to Mr. Thacker suggested "an indefinite presumption that those adjudicated to be nonviolent delinquent juveniles will forever be dangerous," and therefore might forever be disarmed. *Id.* at ¶ 102. The statute disarmed Mr. Thacker in perpetuity, remediable only by "an act of grace by the trial court." *Id.* at ¶ 100. This, we explained, went far beyond our Nation's history of disarming laws, which were "tailored to the duration of the danger" the disarmed individual posed. *Id.* at ¶ 89. We therefore held that Mr. Thacker's juvenile delinquency for complicity to marijuana trafficking was too slender a reed on which to base such a perpetual disability. *Id.* at ¶ 95.

**{¶34}** In Mr. Brown's case, the State correctly points out that R.C. 2923.13(A)(2) offers just the sort of temporal limitation missing in *Thacker*. Mr. Brown's statutory disability was created by his indictment for a violent felony offense, and would necessarily terminate with that indictment. If Mr. Brown were convicted of the offense in the indictment, R.C. 2923.13(A)(2) would impose a *new* disability based upon that conviction. And if Mr. Brown were acquitted or his indictment dismissed, his disability would vanish entirely.

**{¶35}** But that point alone fails to carry the day. The problem with the State's

application of R.C. 2923.13(A)(2) to Mr. Brown stems from *Rahimi*'s other two considerations. No court (or jury) expressly found that Mr. Brown poses a danger with a firearm—it bears repeating that the trial court in his robbery case released him on bond with no weapons restriction. Instead, the State argues that Ohio's weapons under a disability statute provides a "legislatively determined proxy for a dangerousness determination." *Thacker* at ¶ 81 (1st Dist.). Such categorical proxy determinations can be permissible, but are subject to judicial scrutiny. *Id.* at ¶ 82. When such proxy determinations rest on prior proceedings, we must consider (1) whether the fact found in the prior proceeding can justify a presumption that the defendant was dangerous, and (2) whether the proceeding provided "an adequate vehicle" for making so weighty a determination. *Id.* at ¶ 83.

{¶36} The substance of Mr. Brown's underlying indictment, and therefore of his underlying disability concerned the commission of a violent felony—in his case, robbery. An individual's prior commission of a violent offense as an adult likely justifies some presumption of dangerousness. *See Williams*, 113 F.4th at 658 (noting the historical rationale for presuming those convicted of "crimes against the person" to be dangerous). For the purposes of this case, however, we need not determine the contours and scope of that presumption.

{¶37} The problem here is how the determination was made. Before the State disarms Mr. Brown for his involvement in a robbery, it must have some method to determine that he was involved in that robbery. The statute provides three methods for making that antecedent determination: (1) indictment, (2) conviction, and (3) juvenile adjudication. *See* R.C. 2923.13(A)(2) (imposing weapons disability on any person who "is under indictment for or has been convicted of any felony offense of violence or has been adjudicated a delinquent child" for equivalent conduct). In Mr.

13

Brown's case, we deal only with the first of these.

**{¶38}** In general, the State must initiate its felony prosecutions by grand jury indictment, unless the defendant validly waives that right. *See* Ohio Const., art. I, § 10 (providing generally that "no person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury"); Crim.R. 7(A). The grand jury is a body of nine individuals, convened and charged by the court of common pleas "to inquire of and present all offenses committed within the county." *See* R.C. 2939.08; Crim.R. 6(A). The prosecutor may appear before the grand jury, furnish the grand jury with information on any "matter cognizable by it," interrogate witnesses before it, and offer legal arguments. *See* R.C. 2939.10. Upon receiving such evidence and counsel, the grand jury, by a vote of seven or more jurors, may find and return a true bill of indictment against a defendant. *See* Crim.R. 6(F).

**{¶39}** Because they are preliminary, grand jury proceedings lack many of the touchstones of a criminal trial. Neither the defendant nor his counsel has a right to be present. *See* Crim.R. 6(D) (delineating who may present to the grand jury); R.C. 2939.10 (same); *State v. Stafford*, 2002-Ohio-5243, ¶ 70 (7th Dist.) ("[T]he accused has no right to appear before a grand jury, either personally or through counsel."). Such proceedings are generally kept secret, *see* Crim.R. 6(E), and do not require juror-unanimity, *see* Crim.R. 6(F). In presenting to the grand jury, prosecutors are not encumbered by the Ohio Rules of Evidence, *see* Evid.R. 101(D)(2), or the Fourth Amendment's exclusionary rule, *see United States v. Calandra*, 414 U.S. 338, 354 (1974), leaving them free to rely upon hearsay or evidence seized unlawfully. Further, the prosecutor may withhold from the grand jury material evidence that would be exculpatory to the accused. *State v. Wilks*, 2018-Ohio-1562, ¶ 31, citing *United States v. Williams*, 504 U.S. 36, 51-52 (1992). This is why, as the old adage goes, many believe

that you can indict a ham sandwich.

**{¶40}** The grand jury's job is to evaluate probable cause that the crime occurred, in other words that the State "demonstrate[d] a 'fair probability' that a crime has been committed" and raised "'more than a bare suspicion'" of the defendant's guilt. *See State v. Ferguson*, 2024-Ohio-576, ¶ 21 (8th Dist.), citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), and *State v. Martin*, 2022-Ohio-4175, ¶ 18. A grand jury's indictment, therefore, does not warrant a presumption that the defendant committed a crime, only that probable cause existed to think that he may have. *See Ferguson* at ¶ 21; *State v. Rodano*, 2017-Ohio-1034, ¶ 22 (8th Dist.), citing *Williams* at 51 ("The grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge.").

**{¶41}** But a determination of dangerousness can be grounds for disarmament, even if based upon something less than proof beyond reasonable doubt. *Compare Rahimi*, 602 U.S. at 701-702 (upholding weapon disability based on dangerousness finding in domestic-violence restraining order proceeding). To determine whether a given proceeding fits within our historical tradition of disarming dangerous persons, we, like the Court in *Rahimi*, consider whether the modern and founding-era proceedings are comparably tailored to discern the party's dangerousness, and whether they employed at least comparable procedural protections in doing so. *Compare Thacker*, 2024-Ohio-5835, at ¶ 82 (1st Dist.).

**{¶42}** To this end, the State analogizes the application of R.C. 2923.13(A)(2) in this case to founding-era surety laws, which featured prominently in *Rahimi*. *See Rahimi* at 695-696. In the late 18th century, justices of the peace and other judicial officials could, upon complaint, demand that "suspected persons find particular and special securities for their future conduct." *See* 4 Blackstone, *Commentaries on the*

*Laws of England* \*252 (1769).  If, after taking evidence and hearing the parties, the justice found there was "due cause shown," he could demand of the suspected individual sureties—usually sureties for the peace or for the good behavior.  *Id*. at \*252-253.

**{¶43}**  Traditionally, the sureties were people—individuals who were willing to guarantee that their principal (i.e., the "suspected person[]") would not engage in the feared conduct by together signing a "recognizance or obligation to the king."  *Id*. at \*252.  Recognizance notes (1) they required the principal to appear before a court on a date certain, (2) they imposed, if applicable, some condition the principal must observe until that date, (3) they acknowledged a semi-fictional pre-existing debt owed by the principal and his sureties to the Crown or to the people of the state, and (4) they stated that the debt would be forgiven if the principal appeared upon the recognizance date and complied with the condition.  *See* 4 Burn, *The Justice of the Peace, and Parish Officer* 84 (16th Ed. 1788); Dunlap, *The New-York Justice* 364-365 (1815) (adapting and modifying Burn's summary of English law to fit the law of New York).

**{¶44}**  A failure to find sureties (or in later times, to post a bond) precluded the signing of a recognizance, and meant the suspected individual could be jailed.  *See Rahimi*, 602 U.S. at 695, citing Mass.Rev.Stat., Ch. 134, § 6 (1836); Dunlap at 393 ("It seemeth certain that if the person to be bound be in the presence of the justice, he may be immediately committed, unless he offer sureties . . . ."); 4 Burn at 269.  And, if the suspected individual engaged in any action that breached the terms of the recognizance, or if that individual failed to appear on the fixed date, the debt would come due or the bond would be forfeit.  *Rahimi* at 695, citing 4 Blackstone at \*253; Dunlap at 395; 4 Burn at 273-275.  Thus, in practice, the surety-and-recognizance system operated as a sort of legal threat: behave as the recognizance demanded and

16

show up on the date specified, or else you (the principal) and your friend (the surety) owe the government money.

**{¶45}** The conduct required in these recognizances varied. Sometimes the recognizance simply required the undersigned not to breach the peace. *See* 4 Burn at 265-277; Dunlap at 391-395; 4 Blackstone at *253. However, if the suspected individual "'be not of good fame,'" the justice could bind the signer to his "good behavior," an obligation that reached further than merely keeping the peace. *See* Dunlap at 397, quoting An Act Declaring the Powers and Duties of Justices of the Peace, in *Laws of the State of New York*, 36th Sess., Vol. 2, Ch. 104, § 1, at 506 (1813). These obligations could be general, or with respect to a particular complainant. *See* 4 Blackstone at *255 (distinguishing between "special" and "general" recognizances for keeping the peace). And, in some circumstances an individual might be required to give surety or "post a bond for going armed." (Cleaned up.) *Rahimi*, 602 U.S. at 696 (2024), discussing Mass.Rev.Stat., Ch. 134 (1836).

**{¶46}** The surety laws suggest that, in certain instances, individuals at the founding *could* be disarmed on less than conviction beyond a reasonable doubt. However, they remain a far cry from the disarmament at issue in this case. For example, the Court in *Rahimi* emphasized that firearm surety laws instructed a magistrate to take evidence and provide an opportunity for the accused to be heard. *See Rahimi* at 696-697, citing Mass.Rev.Stat., Ch. 134, § 3-4. As noted above, Mr. Brown had *no* right to be heard or to present evidence in the proceeding before the grand jury that led to his indictment, and the prosecutor was not obligated to present any evidence favorable to him. *See Stafford*, 2002-Ohio-5243, at ¶ 70 (7th Dist.); *Wilks*, 2018-Ohio-1562, at ¶ 31.

**{¶47}** Founding-era surety proceedings were also inherently *forward-*

17

*looking*, meant to assess present or future risks. *Rahimi*, 602 U.S. at 696 (2024), quoting Mass.Rev.Stat., Ch. 134, § 1 (surety required a complaint from an individual "'having reasonable cause to fear' that the accused would do him harm or breach the peace"). As one author advised New York's justices of the peace in 1815,

> The surety of the peace shall not be granted, but where there is a fear of *some present or future danger*, and not merely for a battery or trespass that is past, or for any breach of the peace that is past; for this surety of the peace is only for the security of such as are in fear; but the party wronged may bring his action, or punish the offender by indictment, and the justice, if he see cause, may bind over the affrayer to answer unto the indictment.

(Emphasis added.) Dunlap, *The New-York Justice* at 392; *accord* 4 Burn, *The Justice of the Peace, and Parish Officer* at 268. While justices of the peace could consider past conduct, they did so as a means of assessing an individual's future danger. *See* Dunlap at 391; 4 Burn at 266. By contrast, the grand jury's inquiry when indicting Mr. Brown was necessarily *backward-looking*. The grand jury was to indict Mr. Brown if it found probable cause to believe that Mr. Brown *had* committed a criminal offense, not merely if it believed him likely to engage in such conduct *again*.

**{¶48}** These procedural elements illustrate the basic rationale underpinning the surety laws, and help us to understand the scope and bounds of the Second Amendment right in this area. The right to keep and bear arms, protected by the Second Amendment, was not a privilege one forfeited as a punishment, but a right that yielded when an individual was found by a court to be particularly dangerous. While such determinations were sometimes categorical, they were often, as in the surety laws, individualized and forward-looking. *See Thacker*, 2024-Ohio-5835, at ¶ 45-48

(1st Dist.).

**{¶49}** In this case, no judicial official or body found that Mr. Brown posed a prospective danger with a weapon. In fact, the one judicial officer who scrutinized his conduct let him walk free on bond without any firearm restriction. While the State insists that simply being accused of a crime warrants stripping someone of his Second Amendment rights, it fails to validate this conclusion with actual authority from the historical record.

**{¶50}** At a bail determination, the trial judge should consider "the weight of the evidence against the defendant" and the "confirmation of the defendant's identity," as well as his history and life conditions, before imposing conditions of pretrial release. R.C. 2937.011(E). Thus, when considering whether to disarm the defendant as a condition of bail, the trial court can distinguish between a defendant caught on video firing a weapon into the ceiling of a bank, and a defendant whose indictment was founded on the testimony of self-interested informants and coincidental circumstances? So, too, might it treat an individual with a history of violent or erratic conduct differently from an individual with no criminal record and a history of responsible hunting or sport-shooting. As best we can glean from the record, the trial court in Mr. Brown's robbery case considered the appropriate bail factors and not only allowed him to go free subject to an ankle monitor, but it declined to impose any restriction on his possession of firearms. We would not expect an inherently dangerous person to be treated this way.

**{¶51}** The forward-looking pretrial-release inquiry accounts for many of the procedural and prospective concerns associated with the surety proceedings of old. Indeed, the origin of our modern system of pretrial release on bail derives from the same instrument used in the surety laws: the recognizance. *See* Dunlap, *The New-*

19

*York Justice* at 41 (noting that bail "must be by recognizance, and that the principal shall appear at the next sessions, or oyer and terminer"). At the founding, the primary difference between giving sureties for the peace and making bail was that, when a principal was bailed, he was not put at his liberty but committed to the custody of his "bail" (i.e., the person serving as surety and signing the recognizance). *See* 4 Burn, *The Justice of the Peace, and Parish Officer* at 143 (noting that "bail is a custody; and therefore the bail may retake the prisoner, if they doubt he will fly, and detain him, and bring him before a justice"); Petersdorff, *A Practical Treatise on the Law of Bail, in Civil and Criminal Proceedings*, 514 (1824) (noting that the bail was "invested with . . . unrestricted authority over the person of the defendant").

{¶52} When an eighteenth-century defendant was admitted to bail, he and his bail signed a recognizance, promising that the defendant would return to answer the charges on a date certain. This process mirrored the surety proceedings, in which an individual found to pose a credible threat with a firearm could likewise be made to sign a recognizance, along with his sureties, promising to appear again before the court on a date certain *and* to behave in the meantime. Ohio's modern practice of granting conditional pretrial release operates within these two traditions, effectively combining the two historical instruments in a single recognizance.

{¶53} Thus, disarmament as an individualized condition of bail fits more comfortably within our Nation's history and tradition of firearms regulation. The State could undoubtedly ask a trial judge to disarm the bailed defendant, and the trial court could oblige, if it found that the defendant posed a particular danger with a firearm. In doing so, the court could consider not only the defendant's alleged offense, which is the only thing considered by R.C. 2923.13(A)(2), but also the evidence against him, his history of violent or criminal conduct, and other appropriate circumstances.

**{¶54}** Channeling disarmament through such a pretrial-release proceeding further guarantees that the defendant receives clear notice whether and when he must forego his weapons, and provides him with an opportunity to be heard on the issue. At his bail hearing, for example, the defendant could raise some peculiar need for self-defense, which the trial court would consider when deciding the "least restrictive conditions" necessary for to ensure public safety and the defendant's return. *See* R.C. 2937.011(A).

**{¶55}** Firearms, violent felonies, and grand-jury indictments all existed in 1791. And the founding generation, like our own, must have feared the harm that those accused of violent felonies could wreak with firearms in the period pending their trial. Yet the State has offered no example of a founding-era law like R.C. 2923.13(A)(2), categorically disarming every individual indicted for certain offenses. Nor has it offered any legal authority suggesting courts imposed such a categorical disarmament as a matter of course. While the "general societal problem" targeted here "has persisted since the 18th century," the State has failed to produce "a distinctly similar historical regulation addressing [the] problem." *See Bruen*, 597 U.S. at 26. Rather, the existence of the founding-era recognizance regimes suggests that the founding generation "addressed the societal problem . . . through materially different means." *Id.* The absence of a categorical rule and historical pedigree of the particularized proceedings are "relevant evidence that [R.C. 2923.13(A)(2)] is inconsistent with the Second Amendment." *Id.*

3.

**{¶56}** The State offers two additional, non-historical arguments in support of its application of R.C. 2923.13(A)(2) to Mr. Brown. First, it points to a "robust majority" of courts that have considered and upheld 18 U.S.C. 922(n) ("Section

922(n)"), the federal pretrial-disarmament statute, in the wake of *Bruen*. *See, e.g.,* *United States v. Posada*, 670 F.Supp.3d 402, 411 (W.D.Tex. 2023) (collecting cases). Nearly all of these are trial court decisions, and are therefore nonprecedential even within their respective jurisdictions.

**{¶57}** In determining what persuasive weight to accord these federal decisions, we must recall that Section 922(n) imposes a much less invasive restriction upon gun ownership. While the federal statute embraces those indicted for a broader array of crimes than R.C. 2923.13(A)(2), 922(n) only forbids those it covers "to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." Simple possession is not covered under 922(n), leaving ample room for a defendant who already owned a weapon to keep it in his home for self-defense (akin to Mr. Brown's situation in this case).

**{¶58}** Ohio's statute sweeps more broadly. R.C. 2923.13(A) renders it a crime to "knowingly acquire, have, carry, or use any firearm" if under a disability. And R.C. 2923.13(A)(2)'s and (A)(3)'s indictment-based disabilities turn every firearm a defendant owns into contraband the second he is indicted. Many of the federal decisions recognize the salience of such a distinction, emphasizing that Section "922(n) is not a wholesale prohibition on the ability keep and carry firearms; indicted individuals are prohibited only from obtaining new firearms or moving firearms already in their possession." *United States v. Gore*, 2023 U.S. Dist. LEXIS 28970, *6-7 (S.D.Ohio Feb. 21, 2023); *accord*, *e.g.*, *United States v. Bartucci*, 658 F.Supp.3d 794, 806 (E.D.Cal. 2023) ("Section 922(n) is arguably less burdensome in firearm regulation than surety laws. Surety laws placed a complete ban on individual's possession of firearms if they were unable to post surety. Section 922(n), on the other

hand, does not prohibit felony indictees from continued possession and/or public carry of firearms . . . .").

{¶59} Further, many of these federal decisions addressing Section 922(n) rely upon analogy to the surety laws—the very analogy we have already considered and rejected with respect to R.C. 2923.13(A)(2). *Compare, e.g., Gore* at \*9; *Bartucci* at 807; *United States v. Simien*, 655 F.Supp.3d 540, 552 (W.D.Tex. 2023); *United States v. Jackson*, 661 F.Supp.2d 392, 414-415 (D.Md. 2023); *United States v. Kays*, 624 F.Supp.3d 1262, 1268 (W.D.Okla. 2022).

{¶60} Most importantly, these federal cases seldom address the relevance of the more individualized and historically pedigreed process of disarming individuals as a condition of pretrial release to the *Bruen* inquiry. And why would they, when Section 922(n) imposes only a restriction on transfer and transport, as opposed to the wholesale pretrial disarmament that federal judges may impose on a case-by-case basis under 18 U.S.C. § 3142(c)(1)(B)(viii)?

{¶61} Finally, the State contends that, because "modern and historical detention laws are far more burdensome than the prohibition against weapon possession while indicted," such a disarmament must surely be constitutional (emphasis omitted). This logic parallels the reasoning of the Supreme Court in its pretrial-asset-seizure cases, like *Kaley v. United States*, 571 U.S. 320, 333 (2014), which held a grand jury's indictment to be conclusive as to a defendant's plausible culpability in that context. Some district courts, like the District of Maryland in *Jackson*, have extrapolated the reasoning of *Kaley* to suggest that, because an indictment can take away your liberty, it can surely take away your guns. *See Jackson* at 404.

{¶62} This comparison to pretrial detention, however, ignores that the State's

power to detain pretrial is circumscribed by the accused's right to bail. The bail hearing ensures an individualized determination of flight risk and dangerousness before a defendant can be released or detained. And while the government may hold some defendants without bail, it may not do so without careful consideration. *See* R.C. 2937.222. Even under the restrictive federal regime of the Bail Reform Act of 1984, a defendant detained based on probable cause may be presumptively detained pending trial for certain crimes, but nevertheless must receive "a full-blown adversary hearing," at which he may attempt to rebut that presumption. *United States v. Salerno*, 481 U.S. 739, 750 (1987); 18 U.S.C. 3142(e)-(g). Such an individualized regime contrasts sharply with R.C. 2923.13(A)(2), which demands no prompt hearing and offers no presumption to rebut; the minute you're indicted for a "violent felony" in Ohio, you must disarm.

**{¶63}** More importantly, the State's greater-includes-the-lesser argument reveals nothing about our Nation's history and tradition of firearms regulations—and it smacks of the very interest-balancing that *Bruen* sought to quash in the Second Amendment context. *See Bruen*, 597 U.S. at 26. Indeed, *Salerno*, the touchstone case permitting pretrial detention without bail, was founded upon a traditional due process balancing of state and private interests. *See Salerno* at 749-752 (weighing "[t]he government's interest in preventing crime by arrestees" against "the individual's strong interest in liberty"). And cases allowing pretrial property seizures through a similar greater-lesser argument, like *Kaley* and *United States v. Monsanto*, 491 U.S. 600 (1989), implicitly rely upon a similar weighing of interests. But *Bruen* was very clear: the scope of the Second Amendment right is fixed by history, brought into the present by analogy. "It is this balance—struck by the traditions of the American people—that demands our unqualified deference." *Bruen* at 26.

\*   \*   \*

**{¶64}** Our Nation has always had ways of disarming individuals who pose a danger to the public. The historical materials before us, however, instruct that disarming someone like Mr. Brown traditionally required a neutral decisionmaker to make an individualized and forward-looking assessment of dangerousness. If the State felt Mr. Brown posed a danger with a weapon, it could have employed such a process by requesting that the trial court order him disarmed as a condition of pretrial release. But the State never sought such a condition, and the judge never imposed one. Therefore, we hold that the application of R.C. 2923.13(A)(2) to Mr. Brown was unconstitutional under the Second and Fourteenth Amendments, overrule the State's sole assignment of error, and affirm the trial court's judgment dismissing the weapon-under-a-disability charge.

Judgment affirmed.

**KINSLEY, J.,** concurs.
**ZAYAS, P.J.,** dissents.

**ZAYAS, P.J.,** dissenting.

**{¶65}** I respectfully dissent. This cause should be remanded to the trial court for further consideration in light of, and consistent with, *United States v. Rahimi*, 602 U.S. 680 (2024). A remand is appropriate when "intervening developments . . . reveal a reasonable probability that the decision below rests upon a premise that the lower court would reject if given the opportunity for further consideration, and where it appears that such a redetermination may determine the ultimate outcome of the matter." *Welsons v. Hall*, 558 U.S. 220, 225 (2010), citing *Lawrence v. Chater*, 516 U.S. 163, 167 (1996) (per curiam).

**{¶66}** Here, in applying *Bruen*, the trial court concluded that "the State's

25

analogy to historical surety laws requiring those who 'stand accused' of a crime to 'post a bond before publicly carrying a firearm' cannot be said to be a comparable burden." However, in *Rahimi*, the Supreme Court clarified the types of historical evidence that courts may rely upon when considering a Second Amendment challenge. *Rahimi* at 693. The Court noted that "some courts ha[d] misunderstood the methodology of [its] recent Second Amendment cases" and explained that "[t]hese precedents were not meant to suggest a law trapped in amber." *Id.* It then held that the Second Amendment "permits more than just those regulations identical to ones that could be found in 1791" and thus does not require a "historical twin" to justify a modern firearm restriction. *Id.* at 680-681.

**{¶67}** The correct constitutional inquiry is whether the restriction is "consistent with the principles that underpin our regulatory tradition," meaning whether it is "'relevantly similar' to laws that our tradition is understood to permit." *Id.* at 681, quoting *N.Y. State Rifle & Pistol Assn. v. Bruen,* 597 U.S. 1, 29 (2022). In this regard, the government must identify only a "historical analogue," not a "historical twin," to the challenged regulation. *Id.* at 701. And the State can rely on "relevantly similar" historical precursors even if they do not "precisely match" the regulation at issue. *Id.* at 692. "[W]hen a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.*, quoting *Bruen* at 90. "The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.*

**{¶68}** In light of *Rahimi's* recent clarification of the second step of the analysis, a remand is appropriate for the trial court to consider whether the State's historical

26

analogues are "analogous enough to pass constitutional muster."[2] *Id.*

**{¶69}** Accordingly, I would reverse the judgment of the trial court and remand the cause to the trial court to reconsider the issue in light of, and consistent with, *Rahimi. See, e.g., Vincent v. Garland*, ___ U.S. ___, 144 S.Ct. 2708 (2024) (vacating judgment and remanding for further consideration in light of *Rahimi*); *Jackson v. United States*, ___ U.S. ___, 144 S.Ct. 2710 (2024) (vacating judgment and remanding for further consideration in light of *Rahimi*).

Please note:

The court has recorded its entry on the date of the release of this opinion.

---

[2] The State may have additional analogues for the Court to consider in light of *Rahimi*.