[Cite as *State v. Philpotts*, 2025-Ohio-1179.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                    :

    Plaintiff-Appellant,         :

                                 No. 114047

    v.                           :

DELVONTE PHILPOTTS,               :

    Defendant-Appellee.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 3, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-619945-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellant.*

Cullen Sweeney, Cuyahoga County Public Defender, and Robert B. McCaleb, Assistant Public Defender, *for appellee.*

EILEEN A. GALLAGHER, A.J.:

{¶ 1} The State of Ohio appeals the trial court's judgment entry declaring a portion of R.C. 2923.13(A)(2), which governs having weapons while under disability, facially unconstitutional under the Second Amendment to the United

States Constitution, vacating Delvonte Philpotts' ("Philpotts") conviction and granting his motion to dismiss. The issue in this case is whether the State can temporarily disarm a person who is "under indictment for . . . any felony offense of violence . . ." given the United States Supreme Court's recent jurisprudence of the Second Amendment's right to keep and bear arms. For the reasons that follow, we affirm the trial court's judgment.

## I. Facts and Procedural History

{¶ 2} On March 10, 2017, Philpotts was indicted for rape and other associated offenses in Cuyahoga C.P. No. CR-17-614957 (the "Rape Case"). Philpotts posted bond and was released from jail on April 17, 2017. The court did not prohibit Philpotts from having a weapon as a condition of bond in the Rape Case although it did require him to wear a GPS home monitoring ankle bracelet.

{¶ 3} On July 27, 2017, while he was still under indictment in the Rape Case, Philpotts was arrested after he posted four pictures on social media of himself posing with a firearm. It is unclear precisely when these photographs were taken, but Philpotts is wearing a GPS home monitoring ankle bracelet in the photographs, indicating the pictures were taken while he was out on bond in the Rape Case. Police searched Philpotts' house the same day and recovered the Taurus 9 mm handgun Philpotts was holding in the photographs that he posted on social media. Philpotts admitted to police officers that he knowingly possessed the gun while under indictment.

{¶ 4} On August 4, 2017, Philpotts was indicted in this case for having a weapon while under disability in violation of R.C. 2923.13(A)(2), which states, in part, "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm . . . if . . . [t]he person is under indictment for . . . any felony offense of violence . . . ." Philpotts' "disability" for the purpose of this weapons charge was that he was "under indictment" in the Rape Case. Pursuant to R.C. 2901.01(A)(9), rape in violation of R.C. 2907.02 is a felony offense of violence.

{¶ 5} On November 27, 2017, the court issued a journal entry in the Rape Case stating that the "State of Ohio's motion to dismiss without prejudice is hereby granted."

{¶ 6} On January 3, 2018, Philpotts filed a motion to dismiss the indictment in this case, arguing that "Ohio's statute criminalizing the otherwise lawful possession of a firearm for merely being accused of a crime is an aberration in American law and violates [] Philpotts' Second and Fourteenth Amendment rights under the United States Constitution . . . ." The trial court held a hearing on Philpotts' motion to dismiss on March 14, 2018, and summarily denied the motion on April 25, 2018.

{¶ 7} On May 9, 2018, Philpotts pled no contest to having a weapon while under disability and, on June 5, 2018, the court sentenced Philpotts to three years of community-control sanctions.[1]

{¶ 8} Philpotts appealed the denial of his motion to dismiss, arguing that the portion of R.C. 2923.13(A)(2) which disarmed people "under indictment" was unconstitutional in that it violated the Second Amendment both facially and as applied. On July 18, 2019, this court affirmed the trial court's denial of Philpotts' motion to dismiss, finding that "Ohio's General Assembly acted within the constitutional parameters set forth by the United States Supreme Court in *District of Columbia v. Heller* [554 U.S. 570, 628-629 (2008)] in prohibiting individuals under indictment for a felony offense of violence from ownership of firearms." *State v. Philpotts*, 2019-Ohio-2911, ¶ 49 (8th Dist.)

{¶ 9} Philpotts appealed and the Ohio Supreme Court accepted this case for review. On December 9, 2022, the Court issued an opinion, the entirety of which states as follows: "The judgment of the court of appeals is vacated, and the cause is

---

[1] Also on May 9, 2018, Philpotts pled guilty to improperly handling a firearm in a motor vehicle in violation of R.C. 2923.16 in Cuyahoga C.P. No. CR-18-627759. The date of this offense was April 9, 2018. On June 5, 2018, the court sentenced Philpotts to three years of community-control sanctions in CR-18-627759, to run consecutively to the community-control sanctions in this case.

In March 2020, Philpotts was indicted for aggravated murder and other associated offenses, including the use of a firearm, in Cuyahoga C.P. No. CR-20-649537. This indictment was based on an armed robbery gone bad, which occurred on September 4, 2018. In May 2021, Philpotts was found guilty of shooting and killing the victim, along with all other associated charges, in a bench trial. In June 2021, the court sentenced Philpotts to life in prison with parole eligibility after serving 29 years. This court affirmed Philpotts' convictions in CR-20-649537 in *State v. Philpotts*, 2022-Ohio-2865 (8th Dist.).

remanded to the court of appeals for reconsideration in light of *New York State Rifle & Pistol Assn. v. Bruen*, _ U.S. _, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022)." *State v. Philpotts*, 2022-Ohio-4362, ¶ 1.

**{¶ 10}** This court issued an opinion on January 26, 2023 stating, in pertinent part, as follows: "This appeal presents a highly unique procedural circumstance. During pendency of the appeal, the United States Supreme Court changed the burden of proof and standard of review when evaluating the constitutionality of a statute regulating firearms. Because of the change in the law, we vacate the trial court's decision and remand this case for the trial court to apply the new standards as set forth in" *Bruen*. *State v. Philpotts*, 2023-Ohio-213, ¶ 1 (8th Dist.).

**{¶ 11}** On December 4, 2023, the trial court ordered the parties "to file supplemental brief[s] to [the] original motion to dismiss in light of recent rulings." On June 5, 2024, the court issued a journal entry summarily finding that Philpotts' motion to dismiss was "well taken and granted" and dismissed the case with prejudice. On June 13, 2024, the court issued a "nunc pro tunc entry as of and for 06/05/2024," wherein the court reiterated that defendant's renewed motion to dismiss is "well taken and granted." The court vacated Philpotts' conviction for having a weapon while under disability and dismissed this case with prejudice. Attached to this nunc pro tunc journal entry was a ten-page "opinion and order" declaring the portion of R.C. 2923.13(A)(2) that disarms people "under indictment for . . . any felony offense of violence . . . ." unconstitutional and conducting an analysis of the reasons why.

{¶ 12} The State appeals from this journal entry raising one assignment of error for our review:

> The trial court committed error when it found that R.C. 2923.13(A)(2) violates the Second Amendment to the United States Constitution and dismissed the indictment.

## II. Law and Analysis

### a. Standard of Review

{¶ 13} The determination of whether a statute is constitutional is a question of law that courts review de novo. *Crutchfield Corp. v. Testa,* 2016-Ohio-7760, ¶ 16. A de novo review requires this court to conduct an independent analysis "without deference to the lower court's legal conclusions." *State v. Tidwell*, 2021-Ohio-2072, ¶ 18.

### b. Facial Challenge to the Constitutionality of R.C. 2923.13(A)(2)

{¶ 14} There are two ways to call into question the constitutionality of a statute: a facial challenge or an as-applied challenge. *Harrold v. Collier*, 2005-Ohio-5334, ¶ 37. "A facial challenge to a statute is the most difficult to bring successfully because the challenger must establish that there exists no set of circumstances under which the statute would be valid." *Id.* An as-applied challenge, on the other hand, "alleges that a particular application of a statute is unconstitutional." *Derrico v. State*, 2019-Ohio-1767, ¶ 17 (8th Dist.).

{¶ 15} In this case, the trial court found that "R.C. 2923.13(A)(2)'s prohibition on possession . . . of firearms is unconstitutional . . . as applied to persons, such as Philpotts, who are under indictment . . . ." Despite using the

language "as applied," the final appealable order at issue in this case declares a portion of the having weapons while under disability statute unconstitutional on its face. Furthermore, the parties, in their appellate briefs, agree that this case concerns a facial challenge to R.C. 2923.13(A)(2). We proceed accordingly.[2]

### c. Background

#### i. The Second Amendment to the United States Constitution

{¶ 16} "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

#### ii. Revised Code 2923.13(A)(2)

{¶ 17} "Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm . . . if . . . [t]he person is under indictment for . . . any felony offense of violence . . . ."

#### iii. History of Challenging Laws as Unconstitutional

{¶ 18} Historically, constitutional challenges to laws, including statutes, required courts to engage in a "means-end" or "interest-based" analysis by weighing an individual's right against the government's interests. This balancing test incorporated tiers of scrutiny, ranging from "strict," which pitted a fundamental individual right against a compelling governmental interest, to "rational basis,"

---

[2]On October 1, 2024, the Ohio Supreme Court agreed to hear *State v. Striblin*, 2024-Ohio-2142 (5th Dist.), accepting four propositions of law related to the constitutionality of firearms regulations under the Second Amendment for review. Furthermore, the Court has held several firearms cases for release in anticipation of *Striblin*, including a case from this District, *State v. King*, 2024-Ohio-4585 (8th Dist.).

which measured a nonfundamental right against a rationally related government interest.  *See generally Epply v. Tri-Valley Local School Dist. Bd. of Edn.*, 2009-Ohio-1970.  "The modern tiered scrutiny test traces its roots to the 1819 case *McCulloch v. Maryland*[, 17 U.S. 316 (1819)]."  Phillip J. Closius, *Lochner's Revenge: Tiered Scrutiny and the Acceptance of Judicial Subjectivity*, 90 U.Cin.L.Rev. 779, 784 (2002).  *See also Dist. of Columbia v. Heller*, 554 U.S. 570, 628-629 (2008) (recognizing, but failing to utilize, "any of the standards of scrutiny that we have applied to enumerated constitutional rights").

{¶ 19} Historically, the party challenging the law carried the burden to show it was unconstitutional.  *See, e.g., Yajnik v. Akron Dept. of Health, Housing Div.*, 2004-Ohio-357, ¶ 16 ("[A] party challenging the constitutionality of a law bears the burden of proving that the law is unconstitutional.").

### iv. Challenging Laws as Unconstitutional Under the Second Amendment

{¶ 20} Our Nation's traditional analysis of constitutional challenges changed — at least as related to the Second Amendment — starting in 2008, when the United States Supreme Court released *Heller* and continuing through 2024, when the Court issued *U.S. v. Rahimi,* 602 U.S. 680 (2024).  In short, the United States Supreme Court elevated the Second Amendment to a special status, mandating that courts reviewing constitutional challenges based on the right to keep and bear arms analyze the challenged law using historical analogues from the 18th century.  *See United States v. Johnson*, 2024 U.S. Dist. LEXIS 128302 (N.D.Ohio 2024) (concluding that, as related to the Second Amendment, "there is no other provision of the Constitution

for which the Supreme Court has mandated this mode of analysis: that any federal or state regulation of firearms possession that does not have an historical analogue dating to 1787 is unconstitutional"). With this new test, traditional interest-based analysis no longer applied to Second Amendment cases. *See, e.g., Friedman v. Highland Park*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting; quoting *Heller* at 634) ("*Heller* . . . forbids subjecting the Second Amendment's 'core protection . . . to a freestanding "interest-balancing" approach.'").

{¶ 21} Additionally, according to this new test, the government, rather than the party challenging the law, carries the burden of proof to demonstrate that the law is constitutional. *See State v. Philpotts*, 2023-Ohio-213, ¶ 4 (8th Dist.) (quoting *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022)) (Under the new standard, the "[S]tate now bears the burden of proof and is required to 'justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'"). A synopsis of these landmark Second Amendment cases follows.

{¶ 22} In 2008, the United States Supreme Court released *Heller*, which expanded the interpretation of the Second Amendment to give "law-abiding, responsible" Americans a right to possess guns in their homes "in case of confrontation." *Id*. at 635, 592. The *Heller* Court based this expanded interpretation on "both the text and history" of the Second Amendment. *Id*. at 595.

{¶ 23} In 2010, the United States Supreme Court released *McDonald v. Chicago*, 561 U.S. 742 (2010), which held that, through the Fourteenth Amendment,

the Second Amendment right to keep and bear arms applied to state and local laws. *McDonald* further held that the right to keep and bear arms is a "fundamental right necessary to our system of ordered liberty." *Id*. at 778.

{¶ 24} In 2022, the United States Supreme Court released *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. 1 (2022), which held that the Second Amendment protected "an individual's right to carry a handgun for self-defense outside the home." *Id*. at 10. The *Bruen* Court also held that, in the years since the release of *Heller* and *McDonald*, courts "have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id*. at 17. The *Bruen* Court rejected this method and instead adopted the following two-part test for Second Amendment challenges:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24. The *Bruen* Court noted that a proper analysis now started with "surveying English history dating from the late 1600s, along with American colonial views leading up to the founding" of this country. *Id*. at 20. The Court continued its history lesson with the timeframe preceding and "'immediately after'" the December 15, 1791 ratification of the Second Amendment "'through the end of the 19th century.'" *Id*., quoting *Heller* at 605, 662.

{¶ 25} In 2024, the United States Supreme Court released *U.S. v. Rahimi*, 602 U.S. 680 (2024), and, applying the historical analogue test set forth in *Bruen*, held that a federal law prohibiting individuals subject to domestic violence restraining orders from possessing guns did not violate the Second Amendment. Additionally, the *Rahimi* Court once again clarified the historical analogue test, noting that "some courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber." *Id*. at 691. The *Rahimi* Court stated that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Id*. at 691-692. The *Rahimi* Court continued as follows regarding the finer points of this new test:

> As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." . . .

> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster." The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

(Cleaned up.) *Id.* at 692.

{¶ 26} In *Rahimi*, the defendant challenged 18 U.S.C. 922(g)(8)(C)(i), which states that "[i]t shall be unlawful for any person . . . who is subject to a court order that . . . includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child . . . to ship or transport . . . or possess . . . or to receive any firearm or ammunition . . . ."

{¶ 27} In applying the historical analogue test to the facts of the case, the *Rahimi* Court held that its "analysis starts and stops with Section 922(g)(8)(C)(i) because the Government offers ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." *Rahimi* at 693. The *Rahimi* Court noted that it "reviewed the history of American gun laws extensively in *Heller* and *Bruen*. From the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.*

{¶ 28} Using this historical framework, we turn to whether R.C. 2923.13(A)(2)'s disarmament of those under indictment for violent felonies violates the Second Amendment's right to keep and carry arms.

### d. Analysis — The Portion of R.C. 2923.13(A)(2) that Disarms Individuals Under Indictment for Violent Felonies is Unconstitutional on its Face

{¶ 29} In *State v. Brown*, 2025-Ohio-8 (1st Dist.), our sister court, the First District Court of Appeals of Ohio, found the precise portion of R.C. 2923.13(A)(2) that is being challenged in this case — temporarily disarming people who are under

indictment for violent felonies — unconstitutional as violating the Second Amendment's right to keep and bear arms. Although *Brown* is merely persuasive rather than binding authority, the facts and procedural posture in *Brown* are substantially similar to the facts and procedural posture of this case. The following is taken from *Brown*:

> After [the defendant] was indicted for a robbery but released on bail, officers discovered a gun in his home. The State then charged [the defendant] anew, this time with possessing a firearm while under a disability — specifically, possessing a weapon while under indictment for a felony offense of violence. [The defendant] moved to dismiss the new indictment, and shortly thereafter, the court dismissed his robbery indictment. He thus maintained, and the trial court agreed, that the Second Amendment to the United States Constitution bars a prosecution like this. The State now appeals, asking us to resolve whether the Constitution prohibits Ohio from disarming an individual based solely on his indictment for a felony offense like robbery. On the facts and history presented in this case, we hold that it does. We therefore affirm the trial court's judgment dismissing [the defendant's] indictment.

*Id.* at ¶ 1.

{¶ 30} According to the United States Supreme Court's two-part test outlined above we must first decide if the "Second Amendment's plain text covers" Philpotts' conduct. The latter half of the Second Amendment states that "the right of the people to keep and bear Arms [] shall not be infringed." In *Heller*, the United States Supreme Court held that the phrase "keep and bear Arms" means "to possess and carry weapons." *Heller* at 592.

{¶ 31} As part of the record in this case, four photographs of Philpotts were introduced into evidence. Two photographs show a handgun in the waistband of

Philpotts' pants and two photographs show Philpotts holding a handgun. In one of the "holding-a-handgun" photographs, Philpotts is pointing the gun toward the ground and in the other, Philpotts is pointing the gun at the camera. Philpotts admitted to police that he knowingly possessed the gun.

{¶ 32} Accordingly, we find that Philpotts' conduct of possessing a firearm in this case is covered by the plain text of the Second Amendment.[3] Therefore, under *Bruen*, Philpotts' conduct is presumptively constitutional.

{¶ 33} We must next determine if the State demonstrated that R.C. 2923.13(A)(2)'s prohibition of those indicted for violent felonies from knowingly possessing and carrying firearms "is consistent with this Nation's historical tradition of firearm regulation." *Bruen* at 18.

{¶ 34} A careful reading of the State's brief on appeal reveals that its analysis of the "historical tradition of firearm regulation" is limited to one issue — "precluding gun possession by dangerous persons." The State relied heavily on *Rahimi* for the concept that, historically in this country, "laws confirm what common sense suggests: When an individual poses a clear threat of physical violence

---

[3] The State argues on appeal that, rather than "possessing" the gun, Philpotts was "using" the gun when he "posted photographs of himself posing with a handgun onto social media." The State further argues that "this use of the firearm could never have been contemplated by people in 1791 when the Constitution was amended to protect the right to bear arms." Therefore, according to the State, Philpotts' conduct "is not protected activity" under the Second Amendment. We reject this argument because the photographs plainly show Philpotts possessing the gun, and Philpotts admitted to the police that he possessed the gun. We need not analyze whether Philpotts "used" the gun in this case to determine that his conduct is covered by the plain text of the Second Amendment.

to another, the threatening individual may be disarmed." *Id.* at 698. *See also State v. Skaggs*, 2024-Ohio-4781, ¶ 14 (5th Dist.) ("*Rahimi* reaffirmed the notion that the Supreme Court's previous case of *Heller* was not undermined by *Bruen*, and that when the prohibition related to a convicted felon or someone who is otherwise deemed a danger to others, the Second Amendment is not a bar to disarming such a person.").

{¶ 35} The *Rahimi* Court methodically set forth this Nation's history of regulating firearms and people who threaten harm to others, i.e., dangerous people. *See generally id.* at 693-700. Suffice it to say that founding-era "surety and going armed" laws laid the foundation for disarming a category of individuals deemed dangerous. *Id.* at 693-700. Because the laws dating back to our Nation's founding era have not changed since *Rahimi* was released in June 2024, we direct readers to *Rahimi* for an in-depth analysis.

{¶ 36} Ultimately, the *Rahimi* Court held the following: "When a restraining order contains a finding that an individual poses a credible threat to the physical safety of an intimate partner, that individual may — consistent with the Second Amendment — be banned from possessing firearms while the order is in effect." *Id.* at 690.

{¶ 37} The State argues that the reasoning in *Rahimi*, when applied to Philpotts' situation, requires this court to find that those under indictment for violent felonies are deemed "dangerous people" for the purpose of Second Amendment constitutional analysis. This, of course, would lead to a finding that the

"under indictment for" phrase in R.C. 2923.13(A)(2) is constitutional. The State concedes that "R.C. 2923.13(A)(2) does not have a historical twin" but argues that the statute "certainly fits within the historical tradition of firearm regulation mentioned specifically by the Court in *Rahimi*."

{¶ 38} To proceed with our analysis, an understanding of the phrase "under indictment for" is necessary. The Fifth Amendment to the United States Constitution provides, in part, that prosecutions for what are now labelled as felonies must be instituted by "a presentment or indictment of a Grand Jury . . . ."

{¶ 39} In *Branzburg v. Hayes*, 408 U.S. 665, 686-688 (1972), the United States Supreme Court described the "ancient role of the grand jury" as

> the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions . . . . The adoption of the grand jury "in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice." *Costello v. United States*, 350 U.S. 359, 362 (1956) . . . . Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, its investigative powers are necessarily broad. "It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime." *Blair v. United States*, 250 U.S. 273, 282 (1919).

{¶ 40} As the *Branzburg* Court established, a finding of probable cause is required for a grand jury to indict an accused. *Id*. Probable cause has long been defined as "a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the

person accused is guilty of the offense with which he is charged." (Cleaned up.) *Ash v. Marlow*, 20 Ohio 119, 129 (1851). In other words, "[a]n indictment is a mere accusation, but it indicates that a grand jury had found probable cause to believe in the truth of the accusation." *State ex rel. Lipschultz v. Shoemaker*, 49 Ohio St.3d 88, 90 (1990). *See also Todd v. Weltman, Weinberg & Reis, Co., L.P.A.*, 434 F.3d 432, 441 (6th Cir. 2006) ("A grand jury proceeding is the quintessential form of an ex parte, nonadversarial proceeding where many of the procedural safeguards of a trial do not exist.").

{¶ 41} Additional details concerning grand juries in Ohio are found in Crim.R. 6, which states that a grand jury must have nine members. Crim.R. 6(A). During the presentment of an indictment, the only people who may be present other than these nine grand jurors are: "The prosecuting attorney, the witness under examination, interpreters when needed, and a court reporter . . . ." Crim.R. 6(D). When a grand jury is deliberating or voting, only "the grand jurors and an interpreter for a grand juror . . . may be present . . . ." *Id.* Civ.R. 6(E), which is captioned "Secrecy of proceedings and disclosure," states that grand jury deliberations and votes "shall not be disclosed." However, transcripts of grand jury proceedings may be released upon a court finding of "particularized need." *Id.*; *State v. Greer*, 66 Ohio St.2d 139, 145 (1981).

{¶ 42} Furthermore, the "Rules of Evidence do not apply to grand jury proceedings." *State v. Brown*, 38 Ohio St.3d 305, 308 (1988). The prosecutor has no duty to disclose exculpatory evidence at grand jury proceedings. *State v.*

*Tankers*, 1998 Ohio App. LEXIS 1724 (8th Dist. 1998). "The decision whether to prosecute a criminal offense is generally left to the discretion of the prosecutor." *State v. LaMar*, 2002-Ohio-2128, ¶ 43.

{¶ 43} Taking these parameters into consideration, the question before this court, as we see it, becomes: Does this Nation's history of regulating firearms reveal that a grand jury finding of probable cause that an accused committed a violent felony deem the accused a dangerous person for the purpose of Second Amendment constitutional analysis?

{¶ 44} The State answers this question in the affirmative, arguing as follows:

> [T]he indictees . . . have had a finding of probable cause of their violence determined by a grand jury. This is similar to the surety laws which applied to persons against whom there was probable cause to believe would someday commit misbehavior. In either instance there is a probable cause determination, yet in the case of indictees, that finding is made with regard to violence the person has already committed rather than in the case of the surety laws, evidence of what a person might do in the future.

{¶ 45} The State additionally argues that "the prohibition on indicted persons only extends as long as they are under indictment and, under Ohio's regulatory framework, can be challenged by the indictee in court . . . ." Furthermore, according to the State, "R.C. 2923.13(A)(2) is meant to apply [to] only those who have demonstrated that they are dangerous — based upon evidence proving there is probable cause that they have committed a violent act toward another person."

{¶ 46} Philpotts, on the other hand, answers the question in the negative, citing, among other things, the following:

> [T]he assumption that [the defendant] was more likely to commit crimes than other members of the public, without an individualized determination to that effect, is contradicted by the presumption of innocence: That an individual [that] is charged with a crime cannot, as a constitutional matter, give rise to any inference that he is more likely than any other citizen to commit a crime if he is released from custody. [The d]efendant is, after all, constitutionally presumed to be innocent pending trial, and innocence can only raise an inference of innocence, not of guilt.

*United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006).[4]

{¶ 47} Philpotts argues on appeal that, in looking at this Nation's legal history, "there is no tradition of disarming mere indictees on a blanket, unindividualized basis." Despite not carrying the burden of proof, Philpotts, in his appellate brief, details the absence of historical analogues concerning disarming indictees, from a "1305 English parish court roll" to legislation enacted "close to our own time." Philpotts concludes that "[b]efore 1968, no statute anywhere [in the Nation] criminalized the simple possession of firearms by indictees, and today only Washington and Hawaii . . . do so," in addition to Ohio.[5]

---

[4] *Scott* is not a Second Amendment case. Rather, it affirmed the trial court's granting a motion to suppress by addressing the following issue: "[W]hether police may conduct a search based on less than probable cause of an individual released while awaiting trial." *Id.* at 864.

[5] We note that 18 U.S.C. 922(n) states as follows: "It shall be unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." In short, this federal statute bars indictees from shipping, transporting or receiving firearms. It does not prohibit indictees from possessing firearms. *See, e.g., United States v. Gore*, 118 F.4th 808, 814 (6th Cir. 2024) (stating that 18 U.S.C. 922(n) "prohibits receiving, transporting, or shipping a firearm, but only during the stressful and fraught period between indictment and resolution of a criminal case . . . . And it does not prohibit possessing firearms.").

{¶ 48} Therefore, we limit our analysis to the State's argument that 1) the government may categorically disarm "dangerous people" without violating the Second Amendment and 2) indictees of violent felonies are "dangerous people."

{¶ 49} The problem with the State's position is in the second part of its argument. The State analogizes an indictee's situation, which is based on probable cause found by a nonadversarial grand jury, to "the historical analysis of the surety and terror laws in *Rahimi*." In *Rahimi*, the Court conducted a historical review of surety laws and summarized that "the law authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Id.* at 696. *See also United States v. Stambaugh*, 641 F.Supp.3d 1185, 1192 (W.D. Oklahoma 2022) ("Surety laws required a specific, individualized finding by a neutral magistrate of 'reasonable cause to fear an injury, or breach of the peace.' This required a showing of reasonable cause to fear that a person would cause an injury or breach of the peace *with a firearm*.") (emphasis in original; cleaned up).

{¶ 50} The federal statute at issue in *Rahimi* concerns "any person . . . who is subject to a court order that . . . includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child . . . ." 18 U.S.C. 922(g)(8)(C)(i). In other words, this federal statute requires a court finding of a "credible threat." This court finding can be reconciled with historical surety laws, which required a finding by a magistrate.

{¶ 51} The state statute at issue in this case prohibits people under indictment for a violent felony from having firearms. As demonstrated earlier in

this opinion, being "under indictment" requires a finding by a grand jury of probable cause. We agree with the State that the ban on firearms at issue in this case is temporary, in that it lasts only as long as the case and specifically, the indictment, is pending. We also agree that, pursuant to R.C. 2923.13(A)(2), relief from the ban can be granted on a case-by-case basis.

{¶ 52} As demonstrated earlier in this opinion, being "under indictment" requires only a finding by a grand jury of *probable cause*. *See State v. Ferguson*, 2024-Ohio-576, ¶ 21 (8th Dist.) (A "grand jury indictment creates a presumption of probable cause."); *State v. Rodano*, 2017-Ohio-1034, ¶ 22 (8th Dist.) (emphasis added) ("The grand jury sits **not** to determine guilt or innocence, but to assess whether there is [an] adequate basis for bringing a criminal charge."). A grand jury finding of probable cause is far different from an individualized finding of "dangerous" made by a judicial officer in an adversarial court proceeding where the accused has an opportunity to be heard and present evidence on his or her own behalf.

{¶ 53} Upon review, we find that prohibiting people "under indictment for" a violent felony from possessing firearms is not akin to this Nation's history of regulating firearms and surety laws. The State failed to show that R.C. 2923.13(A)(2)'s prohibition on indictees possessing firearms "is consistent with the principles that underpin" this Nation's tradition of regulating firearms. *Rahimi* at 692.

{¶ 54} This is not to say that the State is without recourse when pretrial disarmament of a potentially dangerous person is at issue. Disarming an accused as a condition of bail after an individualized finding that he or she is dangerous "fits more comfortably within our Nation's history and tradition of firearms regulation." *State v. Brown*, 2025-Ohio-8, ¶ 53 (1st Dist.). The *Brown* Court continued:

> The State could undoubtedly ask a trial judge to disarm the bailed defendant, and the trial judge could oblige, if it found that the defendant posed a particular danger with a firearm. In doing so, the court could consider not only the defendant's alleged offense, which is the only thing considered by R.C. 2923.13(A)(2), but also the evidence against him, his history of violent or criminal conduct, and other appropriate circumstances.
>
> Channeling disarmament through such a pretrial-release proceeding further guarantees that the defendant receives clear notice whether and when he must forego his weapons, and provides him with an opportunity to be heard on the issue. At this bail hearing, for example, the defendant could raise some peculiar need to self-defense, which the trial court would consider when deciding the "least restrictive conditions" necessary . . . to ensure public safety and the defendant's return. *See* R.C. 2937.011(A).

*Brown* at ¶ 53-54.

{¶ 55} Accordingly, the State's sole assignment of error is overruled.

{¶ 56} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, ADMINISTRATIVE JUDGE

EILEEN T. GALLAGHER, J., and
EMANUELLA D. GROVES, J., CONCUR